1                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION

3    FIRSTENERGY FAMILY CREDIT        Case No. 5:12-cv-864
     UNION,                           Youngstown, Ohio
4                                     Wednesday, November 28, 2012
                 Plaintiff,           3:17 o'clock p.m.
5
          vs.
6
     FIRSTENERGY FEDERAL CREDIT
7    UNION, FORMERLY KNOWN AS
     ALLEGHENY ENERGY FEDERAL
8    CREDIT UNION,

9                Defendant.

10
                      TRANSCRIPT OF PROCEEDINGS
11              BEFORE THE HONORABLE BENITA Y. PEARSON
                    UNITED STATES DISTRICT JUDGE
12

13                    SHOW CAUSE HEARING

14

15
     APPEARANCES:
16
     For the Plaintiff:        David T. Movius, Esq.
17                             Matthew J. Cavanagh, Esq.
                               McDonald Hopkins
18                             Suite 2100
                               600 Superior Avenue, East
19                             Cleveland, Ohio  44114
                               (216) 430-2029
20                             (216) 348-5730

21   For the Defendant:        J. Matthew Pritchard, IV, Esq.
                               Cecilia R. Dickson, Esq.
22                             The Webb Law Firm
                               One Gateway Center, Suite 1200
23                             420 Ft. Duquesne Boulevard
                               Pittsburgh, Pennsylvania  15222
24                             (412) 471-8815

25

              Mary L. Uphold, RDR, CRR        (330) 884-7424

```
 1      APPEARANCES (CONTINUED):

 2
        For FirstEnergy Corporation:
 3                                    John M. Skeriotis, Esq.
                                      Heather M. Barnes, Esq.
 4                                    Brouse McDowell
                                      388 South Main Street, Suite 500
 5                                    Akron, Ohio  44311-4407
                                      (330) 535-5711
 6
                                      and
 7
                                      David S. Winston, Esq.
 8                                    FirstEnergy
                                      76 South Main Street
 9                                    Akron, Ohio  44308
                                      (330) 761-4207
10

11      Also Present:                 Timothy Baker, Kevin Daum, Diane
                                      L. Momeyer, John McIlvaine, Esq.,
12                                    Yvonne Phillips, Michael Phillips,
                                      Brenda Trout, Brenda Dils, David
13                                    Friend, Kathleen Sutyak, Cynthia
                                      Menhorn, Daniel Dunlap
14

15      Court Reporter:               Mary L. Uphold, RDR, CRR
                                      Thomas D. Lambros Federal Building
16                                    and United States Courthouse
                                      125 Market Street, Room 337
17                                    Youngstown, Ohio  44503-1780
                                      (330) 884-7424
18

19

20
        Proceedings recorded by mechanical stenography; transcript
21      produced by computer-aided transcription.

22

23

24

25


                      Mary L. Uphold, RDR, CRR          (330) 884-7424
```

```
  1                    P R O C E E D I N G S

  2                           -  -  -

  3              LAW CLERK:  The matter before the court is Case

  4        Number 5:12-cv-0864, FirstEnergy Family Credit Union,

15:17:56  5   Incorporated versus FirstEnergy Federal Credit Union,

  6        Incorporated.

  7              THE COURT:  Good afternoon, everyone.  You may

  8        retake your seats.

  9              Counsel for FirstEnergy Family Credit Union,

15:18:06 10   Incorporated, will you please introduce yourself for the

 11        record and those accompanying you today?

 12              MR. MOVIUS:  Thank you, Your Honor.  My name is

 13        David Movius, and with me is Matt Cavanagh, my co-counsel,

 14        and Mr. Timothy Baker and Kevin Daum, both of FirstEnergy

15:18:23 15   Family Credit Union.

 16              THE COURT:  Welcome to you all.

 17              ALL:  Thank you, Judge.

 18              THE COURT:  Will counsel for FirstEnergy Federal

 19        Credit Union please introduce yourself for the record and

15:18:32 20   those accompanying you here today, sir?

 21              MR. PRITCHARD:  J. Matthew Pritchard for

 22        FirstEnergy Federal.  Today with me I have co-counsel,

 23        Cecilia Dickson, and Diane Momeyer, who is the President of

 24        FirstEnergy Federal.

15:18:48 25        Additionally, I have my partner, John McIlvaine,
```

1    with me.

2              THE COURT:  Your partner --

3              MR. McILVAINE:  (Indicating.)

4              THE COURT:  Thank you, sir.  You may continue.  I

15:18:58  5    just would like to associate the names with the faces.

6              MR. PRITCHARD:  Certainly.  And a full complement

7    of the Board of Directors of FirstEnergy Family as ordered.

8    Federal, I'm sorry.

9              THE COURT:  You may, sir.

15:19:20  10             MR. PRITCHARD:  A full complement of the

11   FirstEnergy Federal board, the names of whom we have

12   supplied to your clerk, Your Honor.

13             THE COURT:  Thank you.  And I do have those names

14   here.  I have a Yvonne Phillips; welcome.  Michael Phillips;

15:19:34  15   welcome, sir.  Brenda Trout; welcome.  Brenda Dils.  Did I

16   pronounce that correctly?

17             MS. DILS:  Yes.

18             THE COURT:  Welcome.  David Friend; welcome.

19   Kathleen Sutyak; welcome.  Did I pronounce that correctly?

15:19:51  20             MS. SUTYAK:  Yes.

21             THE COURT:  Welcome.  Is it "Cynthia" or "Cythia"?

22             MS. MENHORN:  "Cynthia."

23             THE COURT:  Menhorn?

24             MS. MENHORN:  Yes.

15:20:01  25             THE COURT:  Welcome.

                    Mary L. Uphold, RDR, CRR        (330) 884-7424

1                    MS. MENHORN:  Thank you.

2                    THE COURT:  And Daniel Dunlap.  Welcome to you

3     all.

4                    You are finished then, Mr. Pritchard?

15:20:08    5        MR. PRITCHARD:  I am.  Thank you.

6                    THE COURT:  Thank you.  You may retake your seat,

7     sir.

8                    This hearing has been scheduled to allow the court

9     to address plaintiff's motion to show cause filed on the

15:20:16   10   docket and numbered ECF 41, to show cause why Defendant

11   FirstEnergy Federal Credit Union should not be held in

12   contempt.

13                   The purpose of the hearing is to allow the parties

14   to present evidence that will inform the court of whether it

15:20:32   15   has been established by clear and convincing evidence that

16   Defendant FirstEnergy Federal Credit Union, Diane Momeyer,

17   its President and CEO of defendant, and the members of the

18   Board of Directors, along with the attorney, Mr. Pritchard,

19   have resisted or disobeyed the court's preliminary

15:20:54   20   injunction order issued on November 7, 2012, which is also

21   docketed as ECF 39.

22                   It's important that all of you understand, that

23   being all of those persons who are potential contemnors,

24   understand that this is a civil contempt hearing.  The

15:21:15   25   standard is clear and convincing evidence.  The penalty, if

1    I find that there is contempt of my order, may include

2    imprisonment, a prospective fine, which will accrue until

3    the contemnor complies with my order, that being the

4    preliminary injunction, and under exceptional circumstances,

15:21:32  5    a reimbursement of attorneys' fees and costs incurred in

6    bringing the contempt proceeding.

7             I am pleased to see, based upon my sign-in chart,

8    that Ms. Heather Barnes is here as well.

9             MS. BARNES:  Yes, Your Honor.

15:21:47  10            THE COURT:  Thank you.  And with you, and you can

11   tell me if I'm correct, David Winston?

12            MS. BARNES:  Yes, Your Honor.

13            THE COURT:  Welcome to you both.  And Skeriotis,

14   Mr. John Skeriotis?

15:22:01  15            MR. SKERIOTIS:  Yes, Your Honor.

16            THE COURT:  Welcome to all of you.

17            Ms. Barnes, I appreciate you being here, and I

18   know that you were subpoenaed and you are under court order

19   to be here, and I want you to know that while I did not

15:22:11  20   require you appear today as a potential contemnor, I do want

21   you to pay attention, because I will be listening to the

22   evidence with an eye towards determining whether you have

23   been in concert or participation with those whom I'm going

24   to adjudge today have been or have not been in contempt of

15:22:30  25   my order.

1           Can I make that any more clear?

2           MS. BARNES:  I understand, Your Honor.

3           THE COURT:  Thank you.  Thank you all for

4      standing.  You may retake your seats.

15:22:37 5           Counsel, how would you like to proceed?  I made

6      sure that you received notice today, because I became

7      concerned when I received the motion to excuse the members

8      of the board.  And I'm sure that you're very busy persons,

9      but because I do intend to take evidence, I wanted there to

15:22:52 10     be live witness testimony.  I will not accept a statement

11     such as, "I intend to rely on the motion to have a show

12     cause hearing," or the brief in opposition to that.

13          Mr. Movius, your preference regarding proceeding

14     with the presentation of evidence?

15:23:13 15          MR. MOVIUS:  Your Honor, it's my understanding

16     that as the moving party, the burden was on FirstEnergy

17     Family to demonstrate by clear and convincing evidence that

18     there was a controlling court order and that that order had

19     not been complied with, and that's what then led to the

15:23:34 20     calling of this hearing; and at that point, the burden of

21     proof actually shifts then to the accused contemnor to show

22     through evidence that they have, in fact, complied with the

23     terms of the order.

24          We're prepared to proceed in whatever fashion the

15:23:54 25     court would prefer, but it would be my understanding then

```
              1    that as it's a show cause hearing, that it would be the

              2    defendants in this case that would proceed first.

              3            But should the court want us to proceed first,

              4    we're prepared to do so.

 15:24:07     5            THE COURT:  I appreciate that.  I think your

              6    explanation is fair and reasonable.

              7            Mr. Pritchard, are you prepared to start?

              8            MR. PRITCHARD:  I am, Your Honor.  Excuse me.

              9            Thank you for your time today, Your Honor.

 15:24:32    10            First I'd like to begin by saying that we have

             11    taken steps to comply with the court order, including as

             12    late as this afternoon, pursuing settlement with the

             13    plaintiff fully and completely, and including discussions

             14    and negotiations with our insurance carrier, as well as the

 15:24:56    15    plaintiff had made financial demands upon us.

             16            Additionally, we have taken steps to address how

             17    we might be able to change our name to be in compliance with

             18    the court order, and indications from opposing counsel as to

             19    how we might be able to resolve this matter.

 15:25:20    20            And additionally, Your Honor, and a point with

             21    which I know you may disagree, we think that the letter that

             22    we received from Ms. Barnes constituted a change in material

             23    circumstances with respect to the ownership of marks

             24    including "FirstEnergy," particularly in light of your order

 15:25:46    25    on the preliminary injunction.
```

1          I'd like to --

2          THE COURT:  Let me interject just so that you do

3     what I know is your intention, and that is to best serve

4     your client today.

15:26:00  5          That letter has no effect on the underlying legal

6     issues that have brought all of these people to this

7     courtroom today.

8          The issue is not the "FirstEnergy" mark, the issue

9     is FirstEnergy Family Credit Union's name in its entirety,

15:26:19 10    and the proprietary interest that that entity has and the

11    use of that name and objecting to, based upon the law, the

12    confusingly similar name adopted by your client.

13         "FirstEnergy" as the first component is not nor

14    has it ever been the problem.  What you did with perhaps

15:26:42 15    Ms. Barnes in concert with you was to punctuate your

16    disobedience of my preliminary injunction.

17         Simply, all you have to do is to comply by

18    figuring out a way to distinguish FirstEnergy Federal Credit

19    Union from FirstEnergy Family.  By solidifying or believing

15:27:05 20    that you have solidified by establishing a written license

21    agreement with FirstEnergy did nothing at all except to

22    either create the impression that you truly don't understand

23    the main issue, or you have absolutely no respect for the

24    United States District Court.  Neither are attractive

15:27:26 25    results.

Mary L. Uphold, RDR, CRR          (330) 884-7424

1          MR. PRITCHARD:  Yes, Your Honor.

2          THE COURT:  What I'd like to know is what you've

3     done.

4          You tell me that the National Credit Union

15:27:35  5     Administration requires that "Federal Credit Union" be a

6     part of your name.  It is today.  You'd like to continue

7     using "FirstEnergy."  I have no problem with that.

8          What I think you need to do is decide what's going

9     to separate "Federal Credit Union" from "FirstEnergy."  What

15:27:48  10     have you done relative to the National Credit Union

11     Administration?  Have you been in contact with that entity?

12          It's my understanding from the manual that was

13     presented and relied upon by both you and Mr. Movius at the

14     preliminary injunction hearing that there are two -- in

15:28:06  15     addition to "Federal Credit Union" being in the name of

16     every credit union chartered by that organization, that you

17     were to, prior to adopting a name, ensure that the proposed

18     federal credit union name does not constitute an

19     infringement.

15:28:24  20          I don't know if that was done.  My suspicion is it

21     was not.  But there certainly should have been some

22     communication with this National Credit Union Administration

23     before today.

24          MR. PRITCHARD:  Uh-huh.

15:28:38  25          THE COURT:  It should have happened, ideally, in

Mary L. Uphold, RDR, CRR        (330) 884-7424

1    advance of November 7, but certainly soon after November

2    7th, nearly three weeks ago, if it is indeed this entity

3    that you are required to report to before using a name other

4    than the official name.

15:28:56   5    So what have you done --

6    MR. PRITCHARD:  And again, Your Honor, I think

7    that the issue is that we -- it's our view that we're under

8    a legal obligation to use our legal name in transactions

9    with all of our members and depositors.  So it's more than

15:29:12  10    just adding a name or adding a word.

11    And, quite frankly, our most recent settlement

12    position includes complying with that portion of the order.

13    We have evaluated over ten possibilities, some of

14    which, and again, if I may, Your Honor, create some

15:29:36  15    difficulties, because there may be other unrelated

16    third-party rights that we may run afoul of.  So if we were

17    to choose FirstEnergy City, for example, Citibank may have

18    some real objections to that.

19    And so a number of the alternatives that have been

15:29:59  20    proposed by the board and have been worked on diligently by

21    Ms. Momeyer, including a review of all of the credit union

22    names that are registered with the NCUA, together with my

23    evaluation of the availability of those names, have

24    occurred.

15:30:18  25    And I would be happy to go through seriatim since

Mary L. Uphold, RDR, CRR      (330) 884-7424

1    the 7th everything that we have done up to this point to

2    comply with that order.

3         But I would note that the day that the order

4    issued, we did ask for a motion to stay to give us an

15:30:42  5    opportunity to comply with that.

6         And again, we don't want to further confuse even

7    our own members by making a change, having that refused by

8    the NCUA, and then making another change.

9         So we have been -- and, in fact, in discussions

15:31:01  10    the day after the order issued, Mr. Movius had made

11    representations that using "FirstEnergy" to start would

12    continue to be okay with them, made financial demands upon

13    us, and indicated that no immediate action would be taken to

14    attempt to enforce the order of the 7th.

15:31:25  15         And so it's our position that, you know, we need

16    to hold ourselves out that way.  We have -- beyond signage

17    and paraphernalia, there would need to be computer vendors,

18    they would need to update software to print loan agreements

19    and a whole variety of situations that makes complying with

15:31:49  20    your order extremely difficult, Your Honor.

21         THE COURT:  Have you been in contact with the

22    National Credit Union Administration?

23         MR. PRITCHARD:  I have not.  I have relied on our

24    previous name change and the experience that Ms. Momeyer had

15:32:01  25    and the board had in going through that process as a basis

1   for proceeding.

2           THE COURT:  Was what is today FirstEnergy Federal

3   Credit Union in contact with the National Credit Union

4   Administration prior to, when making the name change that

15:32:19   5   you use today?

6           MR. PRITCHARD:  That's correct, Your Honor.  We

7   had filed that whole name change, and that was only perhaps

8   the better part of a year ago.

9           THE COURT:  I want to --

15:32:33   10           MR. PRITCHARD:  It's a new experience -- excuse

11   me.  It's a recent experience to the client.

12           THE COURT:  What is it that you intend to do to

13   establish by clear and convincing evidence that you're not

14   in contempt of my order?  I had my law clerk write to you.

15:32:49   15   I am certainly willing to listen to any statement that you

16   would like to make, which I envision is what you've embarked

17   upon.

18           MR. PRITCHARD:  Uh-huh.

19           THE COURT:  You can complete it.  But I certainly

15:32:59   20   want evidence.  I intend for you to call a witness that I'll

21   swear in, and I'll give you some indication of the kinds of

22   things that would be helpful:  Who knew what?  In your

23   revised declaration that was filed today indicating -- and

24   it indicates at paragraphs -- well, the declaration that

15:33:19   25   explains that there was an error made in the earlier

Mary L. Uphold, RDR, CRR        (330) 884-7424

1    declaration.

2              At paragraphs 6 and 7, you state, "Defendant's

3    counsel promptly informed defendant" -- this is regarding

4    the letter from Ms. Barnes -- "of the communication and

15:33:32  5    defendant determined it would sign the license agreement and

6    it executed the license agreement."

7              I want to know with whom -- whose decision it was

8    to sign the license agreement, and of those board members

9    present, who apart from Ms. Momeyer knew this.

15:33:47  10             You see, the decision I will be making at the

11   conclusion of this hearing is that if there are parties in

12   contempt, I want to be able to list each of those parties

13   and determine whether or not the fee -- not the fees, but

14   the fine that I impose, which will remain in place and

15:34:05  15   accrue by day until you're in compliance, will be joint and

16   severally with X.  I am going to want to put in names.

17             And while all of the board members are here, along

18   with you and Ms. Momeyer, I don't want to put in names if

19   these people were not informed.  This paragraph 6 encourages

15:34:24  20   me that they were.

21             I'd like to hear what you can prove to me through

22   your witnesses about that.  And I don't know that it's

23   necessary to call each board of director.  It may be

24   sufficient to call Ms. Momeyer.  But it is not sufficient

15:34:40  25   for you to proffer that information to me.

15

1          You state at paragraph 7, "Recognizing that this

2     factual circumstance has implications for this litigation

3     regardless of what plaintiff elects to do in response to

4     this letter, defendant attempted to reach plaintiff's

15:34:58   5     counsel to discuss the correspondence on November 16."

6          I will allow you to do what you'd like with that

7     paragraph.  My interest is in, primarily, paragraph 6.

8          MR. PRITCHARD:  And if I may, Your Honor, that's

9     my revised declaration from today?

15:35:16  10          THE COURT:  It is, sir, 58-1.  It's attached to

11     ECF filing 58.

12          MR. PRITCHARD:  I'm sorry, I don't have a copy of

13     that with me.

14          THE COURT:  Do you, Ralph?

15:35:38  15          LAW CLERK:  I can print one off.  I'll be right

16     back.

17          MR. PRITCHARD:  Can you tell me what it says?

18          THE COURT:  Well, I just did.  That's just an

19     example.

15:35:47  20          I think what the point I've made, I don't know how

21     I can make it much more clear, there has not been

22     compliance.  Based upon what you've spread on the record so

23     far today, you're not even close to complying.

24          MR. PRITCHARD:  Uh-huh.

15:36:00  25          THE COURT:  You haven't contacted the organization

1    that you must satisfy to change your name.  You've written

2    that as recently as November 21st in your opposition to the

3    motion to show cause.  You've again in this document, and

4    you've done it several times before, indicated your

15:36:24  5    affiliation with the National Credit Union Administration

6    and your need to satisfy that entity, yet you stand before

7    me today telling me that you haven't contacted that entity.

8    And the order has been issued since November 7th.

9          You tell me that you're considering names, but you

15:36:40  10    haven't shared those names with that entity.  You're

11    concerned about stationery and other matters, but to my

12    knowledge, you've done absolutely nothing.

13          And I'm surprised that that's the case.  It makes

14    me very concerned that you're not at all aware of how very

15:36:59  15    serious this matter is.  Not only for yourself, as the

16    attorney representing the defendant, but also for your

17    clients.

18          And what I want to know is whom will be held

19    responsible, whom I will name as a contemnor, who will be

15:37:16  20    responsible for the dollar amount that I'm likely to impose

21    if I remain convinced, as I am now, that by the conclusion

22    of this hearing, there's going to be clear and convincing

23    evidence that you're in contempt of my order.

24          Does that help you?

15:37:34  25          MR. PRITCHARD:  It does, Your Honor.  If it would

```
         1   please the court, I would be happy to catalog every step

         2   that we've taken since the issuance of the order in an

         3   attempt to comply with that.

         4              THE COURT:  When you say "we," who has assisted

15:37:49 5   you in taking those steps?

         6              MR. PRITCHARD:  Ms. Dickson and Diane Momeyer and

         7   the --

         8              THE COURT:  Call Ms. Momeyer as your witness and

         9   ask her questions about what steps have been taken.

15:37:59 10             MR. PRITCHARD:  Yes, ma'am.  If you would just

        11   give me a moment, please, Your Honor.

        12              (Pause.)

        13              MS. DICKSON:  Your Honor, if it pleases the court,

        14   may I present Ms. Momeyer's testimony to you?

15:38:35 15             THE COURT:  You may, Ms. Dickson.

        16              MS. DICKSON:  At this time, we call Diane Momeyer.

        17              THE COURT:  Please approach to be sworn.

        18              LAW CLERK:  Raise your right hand.

        19              DIANE LYNN MOMEYER, of lawful age, a witness

        20   called by the Defendant, being first duly sworn, was

        21   examined and testified as follows:

        22              LAW CLERK:  Please take a seat at the witness

        23   stand.

        24              THE COURT:  Ms. Momeyer, have you ever testified

15:39:05 25  in a hearing before?
```

1          THE WITNESS:  No, I have not.

2          THE COURT:  I am sure you have some idea, through

3     no other resource than television, Ms. Dickson will put

4     questions to you.  When she's finished questioning you, I

15:39:15   5     will give Mr. Movius an opportunity to cross-examine you.

6     If the court would like to better explore an area that's

7     either been questioned or not, I will ask you a question.

8          In all cases, please remember that you are under

9     oath and are expected to give nothing other than the

15:39:30  10     absolute unvarnished truth to any question put to you.  If

11     you're unable to answer the question, you can ask that it be

12     explained.

13          Although the rules of evidence are suspended, I

14     will entertain objections, but I will ask you to be cautious

15:39:43  15     in doing that, because my goal here is to explore what has

16     been done when and by whom.

17          With that background, Ms. Dickson, are you

18     prepared?

19          MS. DICKSON:  I am, Your Honor.

15:39:54  20          THE COURT:  You may then.

21          DIRECT EXAMINATION OF DIANE LYNN MOMEYER

22     BY MS. DICKSON:

23     **Q.**  Good afternoon, Ms. Momeyer.  Would you please state

24     your full name for the record?

15:39:59  25     **A.**  Diane Lynn Momeyer.

Mary L. Uphold, RDR, CRR        (330) 884-7424

Momeyer - Direct
19

1    **Q.**  And would you tell us your position, please, with

2    FirstEnergy Federal Credit Union?

3    **A.**  I am the President and CEO.

4    **Q.**  Ms. Momeyer, are you aware of the court's November 7th,

15:40:12  5    2012 order that is the subject of this hearing today?

6    **A.**  I am.

7    **Q.**  And can you tell us how you became aware of the court's

8    November 7th order?

9    **A.**  Through your law firm.

15:40:24 10    **Q.**  Okay.  Would that be through contact with either

11    Mr. Pritchard or myself?

12    **A.**  Yes.

13    **Q.**  Do you have a recollection as to when you became aware

14    of that order?

15:40:32 15    **A.**  I would probably say it was that day.

16    **Q.**  Do you remember whether or not it was a telephone

17    conversation or in person?

18    **A.**  It was not in person.

19    **Q.**  Okay.

15:40:45 20    **A.**  It would have probably been a phone call, I assume.

21    **Q.**  Did you receive a copy of that order?

22    **A.**  Yes, we received a copy.

23    **Q.**  Upon receiving notification of the court's order,

24    generally speaking, what actions did you take?

15:41:00 25    **A.**  We had been going through every step possible in our

Mary L. Uphold, RDR, CRR        (330) 884-7424

Momeyer - Direct                    20

```
          1    mind through the credit union and through the board as to

          2    how we would need to proceed with anything and everything.

          3    We didn't want to leave any stone unturned.

          4         So at that point, we had said that we needed to still

15:41:22  5    work towards settlement, if possible, with Family, and that,

          6    if I recall correctly, we were going to make them an offer,

          7    monetary offer after speaking with CUNA, our insurance

          8    agency, and also offered to insert a word in between the

          9    "FirstEnergy" and the "Federal Credit Union."

15:41:46 10         And we were ready to do that because of the order that

         11    we had received.

         12    Q.  Okay.  I want to break down each of those items that

         13    you just discussed.

         14         When you received the order, what actions did you take

15:41:59 15    to notify other members of the FirstEnergy Federal Credit

         16    Union employees or the board?  What did you do physically

         17    sort of with the order and the knowledge that you had?

         18    A.  I shared it with the Board of Directors.

         19    Q.  You indicated as --

15:42:18 20              THE COURT:  Before you go on, will you please tell

         21    me how you shared it with the Board of Directors?  Did you

         22    call a meeting, send an e-mail?  What did you do?

         23              THE WITNESS:  I'd have to look specifically.  We

         24    have done conversations.  We've had multiple phone

15:42:32 25    conversations with the board, and also e-mails.
```

Momeyer - Direct                    21

```
                   But whenever it was something strong and
```

 1                   But whenever it was something strong and

 2      definitive, we would have phone calls, phone conversations.

 3                   THE COURT:  And if you'll indulge me one more

 4      time, Ms. Dickson.

15:42:45  5          Do you believe that you shared a copy of my order

 6      with the Board of Directors?  Did you provide a copy,

 7      electronic or hard copy?

 8                   THE WITNESS:  I believe they probably had received

 9      it.  It might have been from The Webb Law Firm and not from

15:43:02 10     me.  I didn't typically forward things from them, they would

11      send it.

12                   THE COURT:  Thank you, Ms. Dickson.

13      BY MS. DICKSON:

14      **Q.**  You've outlined a couple of steps, Diane.  I want to

15:43:15 15     address them, but I want to take them out of order, if I

16      may.

17          One of the items you talked about was preparing to

18      change your name.  What steps did that involve in terms of

19      consideration of a name change, from your perspective?

15:43:31 20     **A.**  The first time we changed the name, I can use that

21      knowledge to say what it would be for this time; is that

22      what you're asking?

23      **Q.**  What I'm asking is, when you're aware of the court

24      order and you indicated that there had been some discussion

15:43:42 25     about changing your name, what nature -- what were those

Momeyer - Direct                                          22

1    discussions?

2    **A.**   The board, we went through numerous names and talked

3    about which choices we would like to use the best.  I was

4    doing research through the NCUA's website to see if there

15:43:59  5    were other credit unions that had those names, those words

6    in their name, because we're very, you know, leery of

7    choosing something that could cause a potential problem down

8    the road.

9        And also, we were looking on the federal trade

15:44:14  10   government's website, trademark website to see if there were

11   any words that would be a potential problem.

12       So we were taking the initial steps.

13       Once we would then decide upon a new name, then we

14   would go to the NCUA with that specific name and then ask

15:44:36  15   them.  They don't want us to submit multiple choices.  They

16   want us to -- that's what we did the last time, was to

17   determine what name we wanted to suggest, and then they

18   would go ahead and take their review of that.

19   **Q.**   And is it your understanding then that the NCUA will

15:44:57  20   approve an application with a specified name as opposed to

21   issuing an advisory opinion as to which names may be

22   preferable?

23   **A.**   In order to -- yeah.  In order to receive that name and

24   to give us the certificate, which is what they will use and

15:45:13  25   we would use to give all of our vendors, they would want us

Mary L. Uphold, RDR, CRR          (330) 884-7424

 1   to say the specific name.

 2   **Q.**   The court made reference to a manual that guides the

 3   NCUA practice.  Are you familiar with this manual that the

 4   judge made reference to?

15:45:29  5   **A.**   I am familiar with it a little bit.

 6   **Q.**   Okay.  And one of the provisions, I'm not quoting it

 7   here, but relates to investigating a name to ensure that it

 8   does not infringe on another mark.

 9        Are you familiar with that section that I'm talking

15:45:43 10   about?

11   **A.**   That wording, yes.

12   **Q.**   I want to talk first about the selection of your name,

13   FirstEnergy Federal Credit Union.  Were you aware of that

14   provision at the time that you selected that name?

15:45:54 15   **A.**   Yes, I was aware of that.

16   **Q.**   And what did you do to comply with that provision when

17   you selected the name -- when you, FirstEnergy Federal,

18   selected the name FirstEnergy Federal?

19   **A.**   The first step that we did was we went to -- I sent an

15:46:10 20   e-mail to FirstEnergy Corp to ask them if they would approve

21   of our credit union name being changed to FirstEnergy

22   Federal Credit Union, and I specifically said, "We are aware

23   of the existence of FirstEnergy Family Credit Union."

24        And we thought that was -- the board, we all thought

15:46:29 25   that was our first necessary step, because we felt that they

1    were the owners of that mark, so we went to them first.

2           They replied in an e-mail that they didn't have a

3    problem with it.

4           So we then went to NCUA and asked for that name to be

15:46:45  5    the official name change, and we received the certificate to

6    change the name for that.

7           So those were the steps that we had taken.

8    **Q.**  And when you say you asked the NCUA, that was through a

9    formal application?

15:46:59 10   **A.**  A formal letter from our -- yes, a formal letter.

11   **Q.**  I want to fast forward now to the consideration after

12   this court's order when you're thinking about a name change.

13          You're still aware of that section of the credit union

14   manual that requires that you do some investigation to avoid

15:47:15 15   infringement, correct?

16   **A.**  Right.

17   **Q.**  So at that point, what steps do you take to think about

18   picking a new name?

19   **A.**  Well, that's what we've been doing, is looking on that

15:47:26 20   NCUA.gov site to see if there are any credit unions that

21   have the name in it.  Even though we see multiple credit

22   unions with the same exact name, we're still leery of

23   picking anything that could be similar to another credit

24   union.

15:47:40 25          And then also, we've been looking on the trademark

Mary L. Uphold, RDR, CRR        (330) 884-7424

Momeyer - Direct

25

1    website to see how many hits there are in the class 036 for

2    the financial.

3         And I also know that Matt Pritchard has been assisting

4    us with that, too, on some of our names that we have put out

15:47:58  5    there for potential name change, to see if we thought any of

6    them could be problematic so that we don't have an issue

7    again.

8    **Q.**  When you say you're looking at the website, especially

9    the NCUA website, can you explain to me what it is you're

15:48:13  10    looking for or how you are looking at the website or

11    searching the website?

12    **A.**  Yeah.  There's a search option on the NCUA website

13    where you can type in just even letters or a word and hit

14    the find button to see how many -- what specific names of

15:48:29  15    credit unions exist out there already.  They'll have the

16    credit union name and the state.

17    **Q.**  What search terms were you using as you investigated

18    the NCUA website?  And just sort of generally, how did you

19    come up with your search terms?

15:48:45  20    **A.**  Words that we thought would fit nicely and make sense

21    in our FirstEnergy something Federal Credit Union.  We've

22    thrown "Choice" out there, we've thrown "Premier" out there

23    and "Prime."  Those were probably the top three choices of

24    our board.

15:49:02  25    **Q.**  And I was just going to say, when you say that "we"

Mary L. Uphold, RDR, CRR          (330) 884-7424

1    thought, how did you develop this list of potential options?

2    **A.**   Input -- you know, we would do some research -- I would

3    do some research, our operations manager did some research,

4    some of our board members had suggested names that we could

15:49:18   5    use.

6    **Q.**   Approximately how many names since November 7th have

7    been searched on the NCUA website?

8    **A.**   Probably 20.

9    **Q.**   Okay.  And how many names have been searched on the

15:49:30  10    trademark website?

11    **A.**   That takes a little bit longer.  I've probably done ten

12    on my own.

13    **Q.**   You personally?

14    **A.**   Right, on my own.

15:49:41  15    **Q.**   How long did it take you to do the investigation on the

16    NCUA website?

17    **A.**   It may only take a few minutes per name.

18    **Q.**   Okay.  When you get the search results for the name,

19    what does it look like?  Can you explain it to us?  You type

15:49:59  20    in "Choice," I think was the example you used.  What is the

21    result that you will receive?

22    **A.**   It will show us the credit union name and their state.

23    **Q.**   For the 10 to 20 searches that you conducted, what

24    volume of information did you receive in return?  By that I

15:50:19  25    mean, did you get -- you searched "Choice," for example.

Mary L. Uphold, RDR, CRR       (330) 884-7424

Momeyer - Direct

27

**A.** Some words had less.  Like the word "Advantage," we checked that one.  That had 21, I believe, credit unions that had the word "Advantage" in its name.  Some other words like "Vision" didn't have any.  There was a "Visions," with it plural, but there wasn't any that had just the word "Vision."

**Q.** Did some of those searches have more than 20 results?

**A.** Yes.

**Q.** Can you give me an estimate of what the maximum results were that you got for some of the possible terms, a ballpark?

**A.** Forty.

**Q.** Okay.

**A.** There were some that had a lot.  The word "First" has a lot.

**Q.** And once you received these results, which I understand the search only took a few minutes to generate, what did you do then with these results?

**A.** That's where we've been sending e-mails back and forth with the board to try to determine what word would be best to fit in with FirstEnergy Federal Credit Union.

**Q.** And what types of considerations go into determining, now that you have this NCUA information, which of these potential options might be the best option?

**A.** Well, that's where we wanted to go -- that's where we

Mary L. Uphold, RDR, CRR          (330) 884-7424

Momeyer - Direct

28

1    would go to the trademark site, too, to see how many hits

2    potentially there were; and Matt Pritchard had also taken a

3    few of those a step further to help us to determine what

4    word would best fit.

15:51:48    5    **Q.**  For credit unions, were you investigating the employer

6    sponsor of some of these credit unions to see if it was in a

7    similar industry as FirstEnergy Corporate, your employer's

8    sponsor?

9    **A.**  Some of the words we had looked up were "Power," and

15:52:05   10    that was affiliated with some of the energy, and we also

11    looked up "Energy"; so, yes, some of those were.

12    **Q.**  Did part of your review of the NCUA results include

13    looking at geographic locations for these other credit

14    unions?

15:52:19   15    **A.**  That is definitely something we noticed, too, that if

16    we chose a certain word, I know there was a credit union in

17    Bridgeville, PA, that had a word in it, which was one of the

18    ones that we were looking at, so then we felt that was

19    probably not the best choice for us to use.

15:52:36   20    **Q.**  Did your research also involve doing Internet research

21    on some of these other credit unions in an effort to

22    determine whether there was any overlap in any other respect

23    or any other basis to where that could be confusing if you

24    adopted that mark?

15:52:48   25    **A.**  Yes.  Everything is going through our mind now to try

Mary L. Uphold, RDR, CRR        (330) 884-7424

Momeyer - Direct

29

1     to make sure that we do what we need to do correctly.

2     **Q.**  And you personally were doing some of this research,

3     correct?

4     **A.**  Yes.

15:52:58  5     **Q.**  And that's in addition to your responsibilities as CEO?

6     **A.**  Correct.

7              THE COURT:  Let's clarify.  I appreciate that last

8     question, you personally were doing some of this research.

9     Who else?  When you say "we" checked the trade names or "we"

15:53:15  10     checked with NCUA, who else did this besides you?

11              THE WITNESS:  Our operations manager, he may have

12     also looked up some words, you know, choices as well.

13              THE COURT:  Apart from you and your operations

14     manager, who else are you aware of participated in the

15:53:35  15     search for new names?

16              THE WITNESS:  I know that I had sent an e-mail out

17     to the board stating if you wanted to look on the NCUA

18     website while we're coming up with names, then I gave them

19     the link so that they could perform some of that themselves.

15:53:53  20              I do not know if they had done that when they were

21     making their opinions as to what the name should be, the new

22     word should be to put in.

23              THE COURT:  So is it fair to assume then that you

24     were the person looking for the replacement name?

15:54:11  25              THE WITNESS:  When you say "looking," I could

Mary L. Uphold, RDR, CRR          (330) 884-7424

```
         1   have -- I would have been the one on the websites, but
         2   everybody was trying to determine what a good word would be
         3   for our name.
         4            THE COURT:  Tell me what persons other than
15:54:22 5   yourself were doing to determine what a replacement name
         6   would be.
         7            THE WITNESS:  Again, I don't know if anybody was
         8   doing any searches on their own, just involvement with
         9   conversations and through e-mails as to what a good word
15:54:41 10  would be to include in our name.
        11            THE COURT:  Conversations with whom?
        12            THE WITNESS:  The Board of Directors.
        13            THE COURT:  E-mails with whom?
        14            THE WITNESS:  The Board of Directors.
15:54:50 15           THE COURT:  Thank you, Ms. Dickson.  You may
        16   proceed.
        17   BY MS. DICKSON:
        18   Q.  Ms. Momeyer, can you tell me approximately how many
        19   hours you have spent since November 7th in the process of
15:55:04 20  reviewing the CUNA information, the trademark websites and
        21   developing a list of potential names and sort of
        22   investigating those on the website in the manner we have
        23   just discussed?
        24   A.  I can't.  I didn't track it.  But it's been a
15:55:26 25  significant amount of time, just because of the seriousness
```

1    of everything now.  We felt that that's what we needed to be

2    doing.

3      **Q.**  Maybe let me ask it to you this way:  Every day since

4    this order issued, have you done something to try to

15:55:40  5    determine what a new name should be?

6      **A.**  Yes.

7      **Q.**  And why are you spending the time to investigate a new

8    name?  Why not just put -- pick some word that you like and

9    just put it on there and be done?  Why are you investing

15:55:55  10   this time?

11     **A.**  We still need to make a good representation of our

12   credit union and who can join our credit union.  We're not a

13   bank.  We're not available to the community to join our

14   credit union.  So we need to -- we feel it's important for

15:56:09  15   us to have the "FirstEnergy" name in our credit union.

16   That's who our sponsor company is.  That's who we can offer

17   membership to.

18        And we wanted to make sure that -- it's important to

19   us.  It's important to us, and I say -- myself, that we want

15:56:22  20   to present the best that we can for the credit union

21   members.

22     **Q.**  Other than your selection of this name in conjunction

23   with the Board of Directors once approvals have been put in

24   place as a result of doing all this research and feeling

15:56:40  25   like it's not an infringing name and an application is

1    filed, do you need approvals from anyone other than the NCUA

2    as to what your name is going to be?

3    **A.**  Depending on which name we choose, we still believe

4    that we would -- if we kept the word "FirstEnergy" in our

15:56:54  5    name, that we would want their approval as well.

6    **Q.**  Okay.

7    **A.**  And with the license agreement that was presented to

8    us, then we definitely -- I believe that.

9    **Q.**  And is that because the license agreement indicates

15:57:04  10   that there is an ownership of the mark that includes the

11   word "FirstEnergy," not just the word "FirstEnergy"?

12   **A.**  That's what I believe, yes.

13              THE COURT:  Did that license agreement exist prior

14   to my November 7th, 2012 preliminary injunction order?

15:57:20  15              THE WITNESS:  No.  We had thought that we were

16   going to be hearing from Corp, FirstEnergy Corp, that they

17   were going to have -- that they were going to be involved in

18   this case too.  And that --

19              THE COURT:  You answered my question, it didn't.

15:57:36  20              A document was presented to you that became the

21   license agreement.  Did you sign that document?

22              THE WITNESS:  I did.

23              THE COURT:  Who else signed it, to your knowledge?

24              THE WITNESS:  Myself.

15:57:46  25              THE COURT:  And your signature alone was

Mary L. Uphold, RDR, CRR        (330) 884-7424

1       sufficient for Federal -- FirstEnergy Federal Credit Union

2       to become a licensee of FirstEnergy Corp?

3               THE WITNESS:  It just has my signature on it.

4               THE COURT:  I am interested in moving on to

15:58:04  5    another area.  You can pick up after this.

6               Are you -- do you review the pleadings filed on

7       Federal's behalf by the attorneys representing you?

8               THE WITNESS:  Yes, I believe they were supplied to

9       me.

15:58:19  10           THE COURT:  My question is, do you read them?

11              THE WITNESS:  Yes, I read what I receive.

12              THE COURT:  There was the opposition to the motion

13      to show cause, and it indicates on page 3 of that document

14      that the official charter name of FirstEnergy Federal Credit

15:58:38  15    Union is just what I've stated, FirstEnergy Federal Credit

16      Union, Incorporated.

17              Do you agree?

18              THE WITNESS:  Yes.

19              THE COURT:  And that you can use a name other than

15:58:47  20    your official name, but you must use your official name when

21      communicating with NCUA and for share certificates or

22      certificates of deposit, signature cards, loan agreements,

23      account statements, checks, drafts and other legal

24      documents.

15:59:05  25           Are you aware of that?

Momeyer - Direct

34

1          THE WITNESS:  I'm aware that the word "Federal"

2    has to be in our charter, but we could be FirstEnergy --

3          THE COURT:  My question is different.  You have

4    your official name.  You have it today.  I've ordered that

15:59:19  5    you change it.

6          This pleading that I've just referred to, the

7    opposition to the motion to show cause, states that you can

8    use a different name, you can use a name other than your

9    official name, except in certain cases, and those were the

15:59:37  10   cases that I read.

11         Are you aware of that?

12         THE WITNESS:  Yes.

13         THE COURT:  Why didn't you take steps to limit the

14   use of your official name?  You're going through all of

15:59:50  15   these steps that you've just laid on the record in response

16   to Ms. Dickson's questions to find a different name.

17         Knowing that you could use your official name in

18   certain circumstances but use a different name in other

19   circumstances, why didn't you do that?

16:00:07  20        THE WITNESS:  I probably -- I didn't understand it

21   to be -- we were going to do the whole thing at once.  If we

22   were going to put the name in, another word in, we were

23   going to do that all at once, and just insert that word,

24   FirstEnergy blank Federal Credit Union.

16:00:25  25        So we would take -- there's numerous steps and all

                Mary L. Uphold, RDR, CRR      (330) 884-7424

1    those pieces, that if we had -- if that's what we were going

2    to do, put another word in, then that would have been what

3    we would have proceeded to do.

4            THE COURT:  Am I correct in understanding you to

16:00:44  5    say that while you knew that you could use a different name

6    other than the official name, you chose not to because you

7    wanted to do it all at one time?

8            THE WITNESS:  If I can backtrack.  When you say

9    did I know, I think what I'm thinking of was when we had

16:00:59  10    talked way back about being able to use a trade name, I did

11    not tie that into what your documentation was.  I was still

12    along the lines of do we want to -- do we want to, the

13    credit union, operate, like you said, with your charter name

14    FirstEnergy Federal Credit Union, but let's use something

16:01:28  15    else and have that as a tag line.

16            So, no, I didn't think on November 7th that that

17    was a possibility, we should start doing that to choose a

18    different name as part of the trademark.  I thought that we

19    would do it all at one time and insert a word if that's what

16:01:51  20    we had.

21            And we had offered settlement on the 9th, I

22    believe it was, and that was what was in our settlement, we

23    would offer them monetary and insert a word.  So that was

24    our offer to do that on the 9th of November, where we were

16:02:08  25    prepared to insert a word, if that was going to be part of

Mary L. Uphold, RDR, CRR        (330) 884-7424

Momeyer - Direct                                    36

1    the settlement.

2              THE COURT:  Did you identify the word you were

3    prepared to insert?

4              THE WITNESS:  No.  We didn't have -- we did not

16:02:20  5    insert a specific word.

6              Like I said, we've narrowed it down, but we were

7    under the impression that the settlement was continuing and

8    that we thought that they would accept the settlement terms

9    for the money and to insert the name, because at that point,

16:02:36 10    we felt like your order came out, what else can -- there

11    wasn't too much else we could do, and we were hoping to

12    settle.

13              But we were willing to put that word into that

14    name.

16:02:49 15              THE COURT:  Ms. Dickson, you may continue.

16              Thank you, Ms. Momeyer.

17    BY MS. DICKSON:

18    **Q.**  Ms. Momeyer, when you reached out for settlement on the

19    9th, you indicated that you didn't propose a specific word.

16:02:57 20              Did you propose any limitations on what that second

21    word might be?

22    **A.**  I believe our understanding all along was that we

23    shouldn't pick something that was the letter -- that began

24    with the letter "F."

16:03:08 25    **Q.**  And did you propose that position in an effort to help

Mary L. Uphold, RDR, CRR        (330) 884-7424

1    narrow what the second word could be that would be agreeable

2    in an effort of furthering settlement?

3    **A.**   I don't recall if that was in the e-mails that Matt

4    Pritchard had sent, but I believe that was part of what we

16:03:25  5    had discussed.

6    **Q.**   Okay.  And I just want to ask you one other question

7    about the use of a trade name.

8         Is it your understanding that if you had adopted a

9    trade name on the 7th, on your website, for example, would

16:03:38  10   that have put you in compliance with the court's order?

11   **A.**   I believe we were going to need -- that we would have

12   had to have put that -- inserted that word to comply, and

13   that we were working towards settlement to do that.

14   **Q.**   I understand that.  But I guess my question is, as the

16:03:57  15   court pointed out, there are exceptions to where you cannot

16   use a trade name until it gets approved as your official

17   charter name.

18        So even if you had selected "Allegheny" as your trade

19   name on the 8th, okay, and you were going to be FirstEnergy

16:04:12  20   Allegheny on your website, on some of the documents that the

21   court referenced, you would have to continue to use

22   FirstEnergy Federal Credit Union.

23        Is that your understanding?

24   **A.**   I'm not understanding what you're asking.

16:04:26  25   **Q.**   That's okay.  What I'm asking you is, when you received

1    the court's order and you're thinking about how to comply,

2    are you aware at that point in time that you are able to

3    adopt a trade name that is different than your charter name?

4    **A.**  I did not put two and two together on that piece.

16:04:45   5    **Q.**  Okay.  You've indicated that you went through a name

6    change roughly a year ago when you adopted FirstEnergy

7    Federal Credit Union; is that correct?

8    **A.**  Correct.

9    **Q.**  And could you tell us, generally, the steps that you

16:05:00  10    have to walk through in order to change your name with the

11    NCUA and adopt a new trade name?

12    **A.**  The first step that we had done was brainstorm with the

13    Board of Directors to see which name we thought would best

14    fit our membership.

16:05:18  15    **Q.**  Uh-huh.

16    **A.**  And then we researched on the NCUA site to see what was

17    out there.

18        And then we went to FirstEnergy Corp to get their

19    approval, which is who we believed that we needed to have

16:05:36  20    that approval from.  They were fine, so we went to NCUA with

21    our letter to ask for that name.

22        And once we got that approval, then we received the

23    certificate that we would need to supply to our vendors and

24    other entities to start that name change.

16:05:56  25    **Q.**  And when you say "vendors," can you give me a sense of,

Momeyer – Direct

39

1    are we talking envelopes and stationery and business cards,

2    or are we talking something different?

3    **A.**   No, there's numerous vendors.  We have numerous

4    computer systems that we have for our loan processing.  We

16:06:14   5    have systems that we do for our data processing.  We have

6    our corporate federal credit union that we process our

7    electronic fund transfers through.

8        There are multiple and numerous entities that we dealt

9    with to change the name.

16:06:33  10    **Q.**   Can FirstEnergy Federal wipe out its name throughout

11   all of its systems and things that you're using vendors with

12   on its own, or does it require the use of vendors?

13   **A.**   Unfortunately, it requires the use of vendors to take

14   those steps.

16:06:47  15    **Q.**   Okay.  And why is that?

16   **A.**   They have control of the systems.

17   **Q.**   Okay.  So it's not as easy as just changing a template

18   in a Word document or something like that?

19   **A.**   No.

16:06:57  20    **Q.**   And then just one clarification question, Diane.

21       Prior to receiving the written license agreement from

22   FirstEnergy Corp that you have since executed, was it your

23   understanding that a license existed before you received the

24   written license agreement?

16:07:17  25    **A.**   No.

1    **Q.**  Did you believe that you were a licensee obligated to

2    seek from FirstEnergy Corp their permission to use their

3    mark?

4    **A.**  Yes.

16:07:26  5    **Q.**  And did you have an understanding as to what you were

6    allowed to do or not allowed to do with the "FirstEnergy"

7    mark if you were using it, prior to the court's order?

8    **A.**  Any documents that we wanted to display, we went

9    through FirstEnergy Corporate Communications.  They approved

16:07:53 10    whatever we would create.

11        So, yes, we felt that we needed to run things through

12    them.

13    **Q.**  And other than putting the license agreement in writing

14    when you received that on the -- from Ms. Barnes, when you

16:08:05 15    looked at that written agreement, did it materially change

16    your understanding as to how you were to treat the

17    "FirstEnergy" mark or what your relationship was with

18    FirstEnergy Corp?

19    **A.**  No.

16:08:14 20    **Q.**  So even before the written agreement, that was your

21    understanding of how to proceed in relation to the

22    "FirstEnergy" mark?

23    **A.**  Right.

24            MS. DICKSON:  Can I have a moment, Your Honor?

16:08:25 25            THE COURT:  You may.

```
              1            (Pause.)

              2    BY MS. DICKSON:

              3     Q.   Diane, just one other question.

              4          You've indicated that you've had conversations among

16:08:48      5    people that work at FirstEnergy Federal Credit Union,

              6    correct, your operations manager, for example?

              7     A.   Correct.

              8     Q.   You've had conversations with the Board of Directors,

              9    correct?

16:08:56     10     A.   Yes.

             11     Q.   And you've obviously talked to Mr. Pritchard and to me

             12    about the legal proceedings.

             13          Have you talked to anyone else in an official capacity

             14    about these proceedings?

16:09:07     15     A.   In what official capacity?

             16     Q.   And maybe I'll just ask you, have you had conversations

             17    with your insurance carrier about these proceedings --

             18     A.   Yes.

             19     Q.   -- since receiving the order?

16:09:22     20     A.   Yes.

             21     Q.   And without divulging the content of those

             22    conversations, can you tell me generally the nature or

             23    purpose of those conversations?

             24     A.   We, as a board, wanted to know, you know, as far as the

16:09:35     25    insurance side of it went, you know, what we were -- what
```

1    the credit union would be covered for under the insurance so

2    that we could -- we didn't want to have our credit union

3    members be out money if that wasn't the correct decision to

4    make.

16:09:54   5        We also, of course, have been in contact with them for

6    settlement information, you know, dollar figures that they

7    would be able to do within the settlement.

8    **Q.**  And when you say "dollar figures they would be able to

9    do," that would be to provide a settlement to Family to

16:10:10  10    compensate them --

11   **A.**  Correct.

12   **Q.**  -- for their claim to damages?

13   **A.**  Correct.

14              MS. DICKSON:  I have no further questions, Your

16:10:15  15    Honor.

16              THE COURT:  Ms. Dickson, I have one.

17              Before signing the license agreement, did you call

18   together the members of the Board of Directors for a vote?

19              THE WITNESS:  I believe that they received it

16:10:23  20    through the e-mail.

21              THE COURT:  Did you seek the approval of the board

22   before signing the agreement?

23              THE WITNESS:  Yes.

24              THE COURT:  And you did that by e-mail?

16:10:34  25              THE WITNESS:  Right.  They received the e-mail

Mary L. Uphold, RDR, CRR          (330) 884-7424

Momeyer - Direct

43

```
        1    with the agreement.
        2           THE COURT:  No, I think you're answering something
        3    that I'm not asking.
        4           What I think you're telling me is they have the
16:10:44 5   agreement and it was sent to them by e-mail.  Am I correct?
        6           THE WITNESS:  Correct.
        7           THE COURT:  What I'm asking is, before you signed
        8    it, did you seek their approval?  Did you call them, get a
        9    phone vote, e-mail vote, meet in person, "Let's vote on
16:10:58 10  whether or not I sign this"?
        11          THE WITNESS:  There's been multiple e-mails.  I'm
        12   not certain if I received an e-mail back from each one of
        13   them individually stating whether they approved it or not.
        14          THE COURT:  But you sought the approval?
16:11:14 15         THE WITNESS:  Yes, right.
        16          THE COURT:  You asked if they approved?
        17          THE WITNESS:  Right.  I mean, I wouldn't make that
        18   decision on my own.
        19          THE COURT:  And you signed it having received
16:11:23 20  majority response, what?
        21          THE WITNESS:  I would have to look back at my
        22   e-mails.
        23          THE COURT:  It can't be that hard.  You tell me
        24   you wouldn't make the decision on your own.
16:11:37 25         THE WITNESS:  Right, but I --
```

Mary L. Uphold, RDR, CRR        (330) 884-7424

Momeyer - Cross
44

```
            1         THE COURT:  One at a time.  She is wonderful, but
            2   she can't take us both, my court reporter, so let me speak
            3   and then you can speak.
            4         If you tell me that you would not have made that
16:11:46    5   decision on your own, and then you tell me you're not sure
            6   if you received responses or how many responses, that
            7   doesn't make sense.  Either you received enough yes votes or
            8   you didn't seek votes, you just signed.
            9         Just give me the answer, if you know.  Do you
16:12:05   10   remember?
           11         THE WITNESS:  I 100 percent don't remember if I
           12   have e-mails that say "I approve" from them individually.
           13         THE COURT:  Thank you.
           14         Is there any follow-up to that before Mr. Movius
16:12:30   15   cross-examines?
           16         MS. DICKSON:  No, Your Honor.
           17         THE COURT:  Thank you, Ms. Dickson.
           18         Mr. Movius?
           19         MR. MOVIUS:  Thank you, Your Honor.
16:13:00   20          CROSS-EXAMINATION OF DIANE LYNN MOMEYER
           21   BY MR. MOVIUS:
           22   Q.  Ms. Momeyer, you're aware that -- are you aware that
           23   the preliminary injunction issued by the court indicated
           24   that it was effective immediately?
16:13:16   25   A.  Yes.
```

Mary L. Uphold, RDR, CRR          (330) 884-7424

1    **Q.**  What did you understand that to mean?

2    **A.**  My understanding was that we were still pursuing

3    settlement, and that we also had the opportunity to appeal,

4    and that we did have active conversations regarding the

16:13:37  5    settlement, and that we -- and that The Webb Law Firm was

6    taking actions to pursue the appeal.

7    **Q.**  And so was it your understanding then that the

8    existence of settlement discussions and the pursuit of an

9    appeal meant that FirstEnergy Federal did not have to comply

16:13:56  10   immediately?

11   **A.**  That was my understanding.

12   **Q.**  And where did you get that understanding?

13   **A.**  Unless that was just from my recollection of stating

14   that we were still going for settlement and we still had the

16:14:11  15   opportunity to appeal.

16   **Q.**  Whose statement was that?

17   **A.**  Well, I know in working with The Webb Law Firm, that we

18   would discuss what our options were and what our next steps

19   would be.

16:14:25  20   **Q.**  Were you ever told at any time that immediate

21   compliance, meaning the day the order was issued, was

22   required?

23   **A.**  Not that I recall.

24   **Q.**  Were you ever told that not complying immediately the

16:14:42  25   day the order was issued could have potential consequences

Momeyer - Cross
                                                                46

1    for FirstEnergy Federal or anybody else?

2    **A.**  Not in those words, because we were pursuing other

3    avenues.  We would not have -- "we," meaning me and the

4    board, would not have blatantly disregarded that if it

16:15:08  5    wasn't our interpretation that we were still pursuing

6    settlement and had the opportunity for appeals.

7    **Q.**  Did you have conversations with anyone about what the

8    word "immediately" in the preliminary injunction meant?

9    **A.**  No.

16:15:24  10    **Q.**  Did you ask anybody questions regarding what that

11    required?

12    **A.**  No.

13    **Q.**  FirstEnergy Federal does continue to use the name

14    FirstEnergy Federal Credit Union, correct?

16:15:36  15    **A.**  As of right now, yes.

16    **Q.**  So have you personally talked to anybody with the

17    National Credit Union Administration regarding this case at

18    all?

19    **A.**  No.

16:15:54  20    **Q.**  Do you know if anyone acting on behalf of FirstEnergy

21    Federal Credit Union has ever talked to a representative of

22    NCUA regarding this case?

23    **A.**  Not to my knowledge.  We have our -- as Matt Pritchard

24    had stated, we have our experience as to what we did the

16:16:13  25    last time, so we have an understanding of how that process

                    Mary L. Uphold, RDR, CRR      (330) 884-7424

Momeyer - Cross

47

1   works, and the next -- and when we go to the NCUA with the

2   name, it would be the final name that we have chosen.

3       **Q.**  So nobody went to NCUA on behalf of Federal and said,

4   "There's a lawsuit going on and we may have to change our

16:16:32  5   name"?

6       **A.**  No.  Our NCUA examiner is well aware of it.  I have

7   informed our NCUA examiner from the beginning of this, and

8   recent.

9       **Q.**  And how did you inform the NCUA examiner regarding this

16:16:47  10  matter?

11      **A.**  Well, when she would have -- she would have been in our

12  office in the summertime, and I spoke with her about it at

13  that point.  So they are aware of this.  There's

14  different -- when I say "examiners," that's different than

16:17:09  15  the -- whatever the office is that sends out the names --

16  allows the names.

17      **Q.**  So you haven't talked to anybody at NCUA with

18  responsibility for approving names, correct?

19      **A.**  We were waiting until we chose that final name.  If we

16:17:23  20  had to do that, if that was all part of the settlement

21  agreement.  Because it's been up and down as far as what we

22  thought might happen with the settlement.

23      **Q.**  So that's a no, nobody has contacted the personnel at

24  NCUA responsible for name changes about this lawsuit --

16:17:42  25      **A.**  No.

Mary L. Uphold, RDR, CRR        (330) 884-7424

Momeyer - Cross                                  48

1      **Q.**  -- on behalf of Federal, correct?

2      **A.**  Correct.

3      **Q.**  Now, who with respect to FirstEnergy Federal is in

4      charge of the name change process?

16:17:56  5      **A.**  I would probably be the ringleader.

6      **Q.**  When you say "ringleader," does that mean you

7      essentially have responsibility on behalf of the corporation

8      for leading the name change process?

9      **A.**  I would probably be the one to implement the letter to

16:18:10 10      NCUA after the Board of Directors decides what name that

11      would be.

12      **Q.**  Now, you talked about a process you've been going

13      through regarding looking at the NCUA website, doing various

14      searches and whatnot.

16:18:30 15           How did you decide on that process?

16      **A.**  How did I decide on that process?

17      **Q.**  Did you ask anybody what you should do to begin the

18      steps of the name change?

19      **A.**  That's the same steps that we had done -- that's just

16:18:47 20      what I know.

21      **Q.**  Maybe I will back up a little bit.

22           When you were previously being questioned by

23      Ms. Dickson, I wrote down I think what I understood to be

24      about five different steps of the name change.

16:19:02 25           You listed brainstorming, then researching on the NCUA

Mary L. Uphold, RDR, CRR          (330) 884-7424

1    website, going to FirstEnergy Corporation for approval,

2    going to NCUA for approval, and then actually implementing

3    the name change by working with vendors, including printers

4    and those who deal with your computer software and whatnot.

16:19:24   5        Is that a fair characterization of the steps?

6    **A.**  Yes.

7    **Q.**  Now, you identified about -- looking at 10 to 20

8    different names.

9        Have you settled on a name yet?

16:19:40  10  **A.**  We've narrowed it down, but no, we don't have one

11   specific name, because we were going to take that -- once we

12   picked it, then we would take the time and the expense to

13   finalize that.

14   **Q.**  How many have you narrowed it down to?

16:19:55  15  **A.**  Recently, we had two, two that the board had said that

16   they would be fine with.

17   **Q.**  And what are those names?

18   **A.**  Choice and Premier.

19   **Q.**  Meaning?

16:20:08  20  **A.**  FirstEnergy Choice Federal Credit Union, FirstEnergy

21   Premier Federal Credit Union.

22   **Q.**  When do you expect to actually choose between those?

23   **A.**  As soon as we need to.

24   **Q.**  When do you understand that you need to do that by?

16:20:26  25  **A.**  All along, like I said, we thought we had the

1    settlement issues going on and the appeal, so that's why we

2    hadn't implemented anything, because it would be hard for us

3    to go back -- it would be -- we couldn't -- once we change a

4    name, we have to go with it.  There's too much time,

16:20:47    5    expense, vendors involved to be able to backtrack and change

6    our name back or choose something else.

7                THE COURT:  Are you telling this court under oath

8    that you did not understand that effective November 7, 2012,

9    you were obligated to change your name?

16:21:06    10                THE WITNESS:  We believed -- I believed that --

11                THE COURT:  Yes or no?  Did you understand that

12    when I issued that order imposing the preliminary

13    injunction, that you were then obligated to change your

14    name?

16:21:21    15                THE WITNESS:  No.  Can I continue?  Because of the

16    settlement and because of the opportunity to appeal.

17                So, no, honestly, we didn't think that -- we

18    thought there were other avenues.

19                THE COURT:  Appealing or seeking a stay, whether

16:21:35    20    from this court or from an appellate court, does absolutely

21    nothing to change the full force and effect of the order

22    that Federal has been under since November 7th, 2012.

23                THE WITNESS:  I did not understand that.

24                THE COURT:  Thank you.

16:21:56    25                Mr. Movius, you may continue.

                      Mary L. Uphold, RDR, CRR        (330) 884-7424

1    BY MR. MOVIUS:

2    **Q.**  Just to stay on that topic for a moment then, were you

3    ever made aware of the fact that this court denied

4    FirstEnergy Federal's two motions to stay the preliminary

16:22:09  5    injunction?

6    **A.**  Can you tell me when those dates were?

7    **Q.**  We'll get the exact -- I believe --

8    **A.**  Was the one just today?

9    **Q.**  No, 12 days ago, I believe.  I can get you an exact

16:22:41  10   date, though.

11        The order I'm referring to is on November 16th.

12   **A.**  That's the first one?

13   **Q.**  Yes.

14   **A.**  Yes, and then we were appealing and still trying to

16:23:04  15   settle.  So that was my understanding, that those were our

16   options, to appeal and work with settlement.

17            THE COURT:  So you did not understand that unless

18   my ruling was overturned by a higher court, it stood, you

19   were bound by it?

16:23:25  20            THE WITNESS:  Can you repeat that, please?

21            THE COURT:  Unless my ruling was overturned, you

22   were to be in compliance, change your name as I ordered on

23   November 7?

24            THE WITNESS:  No, because I thought we could still

16:23:40  25   do the appeal and the settlement.  And we had been working

1    with them with settlement, that we were offering settlement.

2              THE COURT:  Mr. Movius, you may go ahead.

3    BY MR. MOVIUS:

4    **Q.**  Now, are you aware that FirstEnergy Federal also filed

16:23:57  5   a motion to stay the injunction with the Court of Appeals?

6    **A.**  I receive the e-mails from The Webb Law Firm, and I

7    read them as much as I could.  I don't know if I get them as

8    timely as they're sent out.  And I try to read through them.

9    But I'm relying on our counsel for -- I'm not able to fully

16:24:25  10  understand all of that and dissect it without their

11   assistance.

12   **Q.**  Were you made aware of the fact that The Webb Law Firm

13   filed a motion with the Sixth Circuit Court of Appeals to

14   stay the preliminary injunction?

16:24:39  15  **A.**  Yes.

16   **Q.**  Are you aware of whether there's been a ruling on that

17   motion yet?

18   **A.**  We just found out a couple hours ago.

19   **Q.**  And that ruling being that the Sixth Circuit denied the

16:24:50  20  motion to stay?

21   **A.**  Correct.

22   **Q.**  You've also made reference a number of times to

23   settlement negotiations.  It would be correct to say that

24   FirstEnergy Federal has never once, in the course of those

16:25:06  25  negotiations, identified a specific name that it would

Momeyer - Cross                                    53

1    change to as part of a settlement, correct?

2    **A.**  Correct, because we were under the impression that it

3    wasn't a sticking point as long as it didn't begin with the

4    letter "F."

16:25:22    5    **Q.**  Are you aware of any -- were you informed of any

6    communications between myself and Mr. Pritchard where this

7    issue was addressed?

8    **A.**  Which issue?

9    **Q.**  About the name change that you refer to as not a

16:25:37  10    sticking point.

11    **A.**  Can you elaborate?  I'm not sure.

12    **Q.**  Let's do it this way:  Following the injunction,

13    FirstEnergy Federal communicated to FirstEnergy Family sort

14    of a framework or a proposal for settlement, correct?

16:26:00  15    **A.**  Correct.

16    **Q.**  That framework did not include a specific proposed

17    name, correct?

18    **A.**  I don't believe so.

19    **Q.**  Were you ever informed of what Family's response on

16:26:09  20    that point was after reviewing that offer?

21    **A.**  I know that they didn't accept the terms.

22    **Q.**  Were you given any explanation of why?

23    **A.**  I don't recall.

24    **Q.**  So you're not aware of whether or not one of the

16:26:29  25    reasons the offer was rejected was because it didn't include

Mary L. Uphold, RDR, CRR        (330) 884-7424

1    a specific proposed name?

2    **A.**  No.

3    **Q.**  Were you ever informed that one of the reasons the

4    offer was rejected was because it did not include a specific

16:26:42  5    time frame for implementation?

6    **A.**  No.

7    **Q.**  Do you recall what the monetary component of that offer

8    was?

9    **A.**  I'm not sure which offer, because there's been a few

16:26:54  10   that I know that we had offered.

11   **Q.**  The first one.

12   **A.**  I'm thinking -- was it $30,000?

13   **Q.**  I believe it was 30- or 35-, I could check, but that

14   sounds about the right ballpark.

16:27:12  15        What was your understanding at that point of what

16   FirstEnergy Family's monetary requirements for settlement

17   were?

18   **A.**  I believe it was more than that.

19   **Q.**  After you learned that that settlement offer had been

16:27:32  20   rejected, what was your understanding of FirstEnergy

21   Federal's need to comply with the preliminary injunction?

22   **A.**  That we had filed an appeal and that we were still --

23   we've always been hopeful for settlement between Family and

24   Federal and CUNA for our insurance with the monetary amount.

16:27:56  25   **Q.**  Going back then to this process here of looking for --

Momeyer - Cross                                           55

1       or trying to settle on a new name.

2            Since the November 7th order, I know you said you

3       couldn't give an estimate of how many hours you spent on

4       complying, but can you give an estimate of the percentage of

16:28:13  5    your time that you spent dealing with complying with the

6       court's order versus the time you've spent on the ordinary

7       operations of FirstEnergy Federal Credit Union?

8       **A.**  Forty percent.

9       **Q.**  Now, you had also indicated that you believed that -- I

16:28:44 10    want to talk to you for a minute about FirstEnergy

11      Corporation's role in this process.  You indicated, and I

12      don't want to mischaracterize your testimony, but you said

13      that following the preliminary injunction order, that you

14      thought that you would hear from FirstEnergy Corporation; is

16:29:04 15    that correct?

16      **A.**  The day of the hearing on the 6th of November, we

17      had -- Matt Pritchard had said that he was still hopeful

18      that FirstEnergy Corp would be becoming involved in the

19      case, because it was his understanding that they felt that

16:29:25 20    they owned the mark and that that could have a potential

21      bearing on this case.

22      **Q.**  When he referred to "that mark," do you know what mark

23      he was referring to?

24      **A.**  My assumption is "FirstEnergy."

16:29:39 25    **Q.**  Did you have any discussion with him about whether

Mary L. Uphold, RDR, CRR        (330) 884-7424

                    1   FirstEnergy Corporation claimed that it had ownership of the

                    2   name FirstEnergy Family Credit Union?

                    3   **A.**   It's our understanding that FirstEnergy Corp has the, I

                    4   believe, the class 36 financial code, or the class for the

16:30:03            5   trademark for financial, and that they had an agreement with

                    6   FirstEnergy Capital out of Canada that had a carve-out in it

                    7   for credit union services.

                    8        So we believed that FirstEnergy would control any

                    9   credit union or financial entity that would have that word

16:30:29           10   "FirstEnergy" in it.

                   11   **Q.**   How did you come to have that belief?

                   12   **A.**   Through The Webb Law Firm and in seeing what we saw

                   13   with that -- with that agreement with FirstEnergy Capital

                   14   from Canada.

16:30:48           15   **Q.**   You indicated that Mr. Pritchard had indicated to you

                   16   on November 6th that he believed that FirstEnergy

                   17   Corporation would be taking some sort of steps; is that

                   18   correct?

                   19   **A.**   Yes.

16:31:02           20   **Q.**   Can you tell me what specifically he said to you

                   21   regarding that?

                   22             MR. PRITCHARD:  Your Honor --

                   23             THE COURT:  A new question.  You don't have to

                   24   answer that question.  It's become painfully obvious that

16:31:17           25   Ms. Momeyer does not understand the effect of the court's

1    order; and based upon her testimony, it's become obvious

2    that at least based upon what you've said here today, that

3    misunderstanding has not been clarified by counsel.  It's

4    shocking and it's disappointing.  That record is extremely

16:31:36  5    clear, well beyond anything that is clear and convincing.

6           Why don't you move on to any other part that you

7    need to shore up.  The court is pretty well satisfied.

8           I do want to take this opportunity to ask

9    Ms. Momeyer, relative to the other persons who are here with

16:31:54 10    you today who serve as members of the Board of Directors for

11    FirstEnergy Federal Credit Union, is it you who was acting

12    regarding this name change situation, while keeping these

13    people involved possibly through e-mail or other

14    communications, it was you acting with The Webb Law Firm,

16:32:16 15    not the individuals sitting in front of you in the back of

16    the courtroom?

17           THE WITNESS:  I have more interaction possibly at

18    times on phone conversations with The Webb Law Firm.  I

19    don't make decisions on my own, so we do, you know, involve

16:32:35 20    the board and collectively discuss things.  But we're

21    receiving --

22           THE COURT:  Have you ever asked the board members

23    something like this:  "We are under a court order to change

24    our name; however, we're going to hold out and appeal, we're

16:32:52 25    going to hold out and try to settle.  Are you okay doing

Mary L. Uphold, RDR, CRR         (330) 884-7424

```
         1    that?"

         2              Did you ever say something like that to the board

         3    members?

         4              THE WITNESS:  No, no.

16:33:02 5              THE COURT:  Do you know if anyone else said

         6    something like that to the board members?

         7              THE WITNESS:  No, not in those terms.  We've had

         8    discussions with The Webb Law Firm with the Board of

         9    Directors on the phone calls, you know, so that they could

16:33:18 10   be informed as well.

         11             But if you wanted to call every one of them up

         12   here, I don't think that any of us thought that -- thought

         13   that the steps that we were taking were not sufficient.

         14             THE COURT:  Thank you.

16:33:35 15             Mr. Movius, you may continue.

         16   BY MR. MOVIUS:

         17    Q.  You referred a couple times to the expense of changing

         18   the name and only wanting to do that once.

         19             Do you know how much it would cost, in sort of hard

16:33:51 20   dollars, FirstEnergy Federal to change its name?

         21    A.  When we changed the name earlier this year, it was

         22   around $10,000.

         23    Q.  And as far as steps or interim steps, I want to ask you

         24   about your website.

16:34:14 25             Does NCUA require FirstEnergy Federal to use any
```

Momeyer - Cross                    59

         1    particular domain name for its website?

         2      A.  Not that I'm aware of, no.

         3      Q.  So you could change the domain name without conferring

         4    with NCUA?

16:34:26 5      A.  I believe so, yes.

         6      Q.  And you could do so without conferring with FirstEnergy

         7    Corporation, correct?

         8      A.  If we had "FirstEnergy" in it, I would ask for their

         9    opinion or approval.  That's still the way I feel.

16:34:45 10     Q.  But if you didn't use "FirstEnergy" as a part of the

        11    new domain name, you wouldn't have to check with them,

        12    correct?

        13     A.  If it did not have "FirstEnergy" in it?  No.

        14     Q.  And you're aware that the preliminary injunction

16:34:59 15   enjoined use of the FirstEnergyFCU.com domain name, correct?

        16     A.  Yes.

        17     Q.  And yet FirstEnergy Federal Credit Union continues to

        18   use that domain name, correct?

        19     A.  We do.

16:35:14 20           MR. MOVIUS:  That's all, Your Honor.

        21           THE COURT:  Any follow-up examination,

        22   Ms. Dickson?

        23           MS. DICKSON:  No, Your Honor.

        24           THE COURT:  You may step down, Ms. Momeyer.

16:35:24 25           THE WITNESS:  Thank you.

              Mary L. Uphold, RDR, CRR      (330) 884-7424

Momeyer - Cross                                        60

1              MR. SKERIOTIS:  Your Honor, may I speak?

2              THE COURT:  Why don't you approach the podium,

3    sir.  Mr. Skeriotis, correct?

4              MR. SKERIOTIS:  Yes, Your Honor.

16:35:41  5              THE COURT:  Would you please state and spell it

6    for the record?

7              MR. SKERIOTIS:  Yes.  John Skeriotis,

8    S-k-e-r-i-o-t-i-s.

9              Good afternoon, Your Honor.  My name, again, is

16:35:50 10   John Skeriotis.  I represent today here Ms. Heather Barnes,

11   as well as Mr. Dave Winston on behalf of FirstEnergy

12   Corporation.

13             As background, I am a shareholder in the law firm

14   of Brouse McDowell, as well as the chair of the intellectual

16:36:08 15   property group of Brouse McDowell.

16             Pursuant to some of the comments made today, Your

17   Honor, with respect to Ms. Barnes' drafting of the license

18   agreement, because this is a different and unique situation,

19   I'm not sure how the court would expect or allow myself to

16:36:22 20   participate in some of the examinations since, in fact, some

21   of the witnesses have some knowledge with respect to the

22   license agreement.

23             I would have liked or would like some opportunity,

24   if the court deems that appropriate, to examine some of the

16:36:38 25   witnesses with respect to the drafting of the license

                Mary L. Uphold, RDR, CRR      (330) 884-7424

<pre>
        1    agreement, and the license agreement, and any communications

        2    between them and FirstEnergy Corp and/or Brouse McDowell.

        3              THE COURT:  Is it your wish to examine

        4    Ms. Momeyer?

16:36:52  5              MR. SKERIOTIS:  I would like to ask her a few

        6    questions, if the court allows that.

        7              THE COURT:  I will.  And if I find that your

        8    questions are not helpful to the decision I intend to make

        9    today, I'll let you know that.

16:37:03 10              Ms. Momeyer, will you please retake the stand?

       11              MR. SKERIOTIS:  Thank you, Your Honor.

       12              THE COURT:  You're welcome, sir.

       13              Ms. Momeyer, I will remind you that you're still

       14    under oath.

16:37:19 15              CROSS-EXAMINATION OF DIANE LYNN MOMEYER

       16    BY MR. SKERIOTIS:

       17     Q.  Good afternoon, Ms. Momeyer.  I'm sorry to drag you

       18    back.  I just have a few questions for you.

       19         With respect to Ms. Barnes, do you know Ms. Heather

16:37:26 20    Barnes?

       21     A.  No.

       22     Q.  Have you ever met Ms. Barnes?

       23     A.  No.

       24     Q.  Have you ever spoken to Ms. Barnes?

16:37:30 25     A.  No.
</pre>

1    **Q.**  Okay.  Mr. Dave Winston, as you know, is seated back

2    here to my left.  You do know Mr. Winston, correct?

3    **A.**  I have met him once, correct.

4    **Q.**  In fact, you met him at a mediation with respect to the

16:37:42  5    parties in this case, correct?

6    **A.**  Correct.

7    **Q.**  Okay.  Other than that, have you ever spoken to

8    Mr. Winston?

9    **A.**  No.

16:37:47 10    **Q.**  We referred to a license agreement earlier.  Do you

11    recall that, those discussions?

12    **A.**  Yes.

13    **Q.**  Okay.  Do you know who drafted that license agreement?

14    **A.**  I believe Ms. Barnes.

16:37:59 15    **Q.**  And your belief comes from possibly your counsel,

16    correct?

17    **A.**  Yes, yes.

18    **Q.**  Okay.  Do you know when that drafting of the license

19    agreement began?

16:38:08 20    **A.**  I don't know when it specifically began.  I know

21    that -- I believe that our counsel had provided examples of

22    other credit unions and their sponsors in regards to license

23    agreements upon Corp's request.

24    **Q.**  Right.  But do you know, when was the first time you

16:38:31 25    ever saw a draft of the license agreement that you

Momeyer - Cross                    63

1    ultimately signed?

2    **A.**  It was after the November -- I think it was maybe that

3    Monday following the November 6 hearing.

4    **Q.**  Okay.  And you don't recall as well -- since Ms. Barnes

16:38:45  5    drafted it, you don't recall when she began drafting it,

6    correct?

7    **A.**  No, no.

8    **Q.**  Your use of the "FirstEnergy" trademark, is it fair to

9    say that the only reason you believe -- and I say "you,"

16:38:57 10   defendants believe that they are allowed to use that mark is

11   pursuant to FirstEnergy Corp, their allowance for you to use

12   that mark?

13   **A.**  Correct.

14   **Q.**  Okay.  Did anyone from Brouse McDowell or FirstEnergy

16:39:12 15   Corp ever tell defendant to not comply with the court's

16   order?

17   **A.**  No.

18   **Q.**  Did anyone from Brouse McDowell or FirstEnergy Corp

19   ever inform the defendants that the license agreement was

16:39:27 20   case dispositive?

21   **A.**  No.

22   **Q.**  Do you know what I mean by "case dispositive"?

23   **A.**  I don't know what that means.

24   **Q.**  That license agreement would end this lawsuit.

16:39:37 25   **A.**  No.

1    **Q.**  Did anyone ever tell you that?

2    **A.**  No.

3              THE COURT:  Do you recall reading a document,

4    either a letter or a pleading, with those words in it?

16:39:45  5              THE WITNESS:  I do recall seeing those words, I

6    believe.

7    BY MR. SKERIOTIS:

8    **Q.**  Do you recall in what form you saw those words?  Do you

9    know who drafted those words?  Do you know anything with

16:39:59  10   respect to where you saw those words?

11   **A.**  I'm not certain.

12   **Q.**  Okay.

13   **A.**  I don't -- I don't know all these legal reports and

14   everything.

16:40:08  15   **Q.**  Well, that's okay.

16        Do you know if that came from your counsel, those

17   words?

18   **A.**  I'm thinking that's where we saw it.

19   **Q.**  Okay.  Do you know if those words -- strike that.

16:40:19  20             MR. SKERIOTIS:  No further questions, Your Honor.

21             THE COURT:  Mr. Skeriotis, Ms. Barnes and you are

22   both officers of the court.  I am going to ask you this

23   question to decide if your answer satisfies me.

24             When was the license agreement drafted?

16:40:32  25             MR. SKERIOTIS:  Prior to the November 6th order,

                    Mary L. Uphold, RDR, CRR          (330) 884-7424

1    prior to -- I believe the exact date was October 29th, if

2    I'm not mistaken.

3                MS. BARNES:  October 29th we were in discussions

4    about that.  The actual drafting occurred October 31st, with

16:40:47  5    a draft turned November 5th.

6                THE COURT:  Ms. Barnes, were you aware of my order

7    when you extended the license agreement to Federal?

8                MS. BARNES:  I became aware of the order hours

9    before the agreement was drafted.

16:41:00 10                THE COURT:  Hours before the drafting that began

11    in --

12                MS. BARNES:  Excuse me.  Before we sent it.  My

13    mistake, Your Honor.

14                THE COURT:  And you sent it knowing my preliminary

16:41:09 15    injunction order was in place?

16                MS. BARNES:  I knew it was in place.  However,

17    because as you have expressed, Your Honor, we were simply

18    trying to memorialize the agreement already in place.  And

19    because it would have no effect on this case, especially

16:41:23 20    your order, that we believed that it was just reducing to

21    writing the understandings of the parties and to protect the

22    "FirstEnergy" name, and that was all.

23                THE COURT:  It did not occur to you then that

24    extending that agreement that was signed could punctuate a

16:41:41 25    willful disobedience of my order?

                    Mary L. Uphold, RDR, CRR        (330) 884-7424

1    MS. BARNES:  That did not cross my mind, Your

2    Honor, not -- and, of course, to the extent it could be

3    implied that way, I certainly apologize on behalf of my

4    client and myself.

16:41:52   5    THE COURT:  Mr. Skeriotis, I am satisfied at this

6    time.

7    Are there any other questions?

8    MR. SKERIOTIS:  I do not have any other questions,

9    Your Honor.  I did prepare a brief background and something

16:42:02  10    I thought would be informative to the court, but we can take

11    that up at a later time at this proceeding, if at all.

12    THE COURT:  I appreciate that.

13    And am I correct in instructing Ms. Momeyer that

14    she's now able to step down?  No follow-up, Ms. Dickson?

16:42:17  15    MS. DICKSON:  None, Your Honor.

16    THE COURT:  Thank you for returning to the witness

17    stand.  You may step down.

18    MR. SKERIOTIS:  Thank you.

19    THE COURT:  Ms. Dickson, Mr. Pritchard, would you

16:42:27  20    like to call any other witness?

21    MR. PRITCHARD:  Yes, Your Honor.  Can we call

22    board member David Friend, please?

23    THE COURT:  Mr. Friend, please approach to be

24    sworn.

16:42:50  25    DAVID FRIEND, of lawful age, a witness called by

1    the Defendant, being first duly sworn, was examined and

2    testified as follows:

3              LAW CLERK:  Please take a seat.

4              THE COURT:  Mr. Friend, you heard the instructions

16:43:08  5    I gave to Ms. Momeyer.

6              THE WITNESS:  Yes, I did.

7              THE COURT:  Thank you.  The same would apply to

8    you.

9              When you're ready.

16:43:16  10              DIRECT EXAMINATION OF DAVID FRIEND

11    BY MS. DICKSON:

12    **Q.**  Hello, Mr. Friend.  Could you just please spell your

13    name for the record?

14    **A.**  Yes, sir.  It's David Friend, D-a-v-i-d, last name

16:43:24  15    F-r-i-e-n-d.

16    **Q.**  And are you currently a member of the Board of

17    Directors of FirstEnergy Federal Credit Union?

18    **A.**  Yes, ma'am.

19    **Q.**  Were you a member -- when did you become a member of

16:43:31  20    the Board of Directors, if you recall?

21    **A.**  Ten or fifteen years ago.

22    **Q.**  Okay.  Mr. Friend, when did you become aware of the

23    court's order on November -- the court's November 7, 2012

24    order?

16:43:44  25    **A.**  That day or the day after.  I don't remember the exact

Friend - Direct                68

1    date.

2    **Q.**  Do you remember how you became aware of the court's

3    order?

4    **A.**  Through an e-mail, I believe.

16:43:52  5    **Q.**  Did you receive a copy of the court's order?

6    **A.**  I did.

7    **Q.**  And do you recall how that was transmitted to you,

8    either by Ms. Momeyer or by Mr. Pritchard?

9    **A.**  I don't recall.

16:44:00  10    **Q.**  Did you review the order when you received it?

11    **A.**  Certainly.

12    **Q.**  Do you recall what the next activity of the board was

13    upon receiving the court's order?

14    **A.**  I think we were -- we initially awaited advice from

16:44:12  15    counsel.  But I made my own interpretation as to what it

16    meant.

17    **Q.**  Do you recall participating in a conference call among

18    the Board of Directors upon receiving the order either the

19    day of or the next day?

16:44:28  20    **A.**  I don't remember a specific call, but I suspect that we

21    had one.

22    **Q.**  Do you recall having a conference call, regardless of

23    the time frame, where the court's order was discussed?

24    **A.**  Yes.

16:44:37  25    **Q.**  And could you please tell the court what your

Mary L. Uphold, RDR, CRR        (330) 884-7424

Friend - Direct                                         69

1    understanding was of the court's order?

2       **A.**   I think my basic understanding was that there were

3    multiple pieces to it.

4         One, because we did not -- I certainly didn't

16:44:54   5    understand the court's actions implying that we could use a

6    trade name in lieu of FirstEnergy -- or FirstEnergy Federal

7    Credit Union.  That strict compliance would be impossible,

8    because we could not transact with our members.  We would

9    effectively have to freeze their funds.  And we couldn't

16:45:22  10    sign checks, we couldn't do anything in action as

11    FirstEnergy Federal Credit Union.

12         That subtlety was completely lost on me, unfortunately.

13      **Q.**   Let me ask you this:  Is it your understanding that

14    even if you adopted a trade name upon receipt of the court's

16:45:37  15    order, you would still not be in compliance with the court's

16    order?

17      **A.**   Exactly.

18              THE COURT:  Mr. Friend, who was on the phone call,

19    the conference call that you're talking about?

16:45:48  20              THE WITNESS:  I don't recall.

21              THE COURT:  How did you get on?  Did you dial in,

22    or did someone call you?  You don't recall any other person

23    on the line?

24              THE WITNESS:  I suspect most of the board and

16:46:00  25    Diane and Mr. Pritchard.  But I don't recall the details of

Mary L. Uphold, RDR, CRR          (330) 884-7424

1     that call, so it's a little difficult to --

2          THE COURT:  And my question was, who else was on

3     the call, not the details of the call.  So you've just said

4     most of the other board members, Mr. Pritchard, Ms. Momeyer?

16:46:19  5          THE WITNESS:  Yeah, that would be my expectation.

6          THE COURT:  Your recollection?

7          THE WITNESS:  Yeah.

8          THE COURT:  Thank you, Ms. Dickson.

9     BY MS. DICKSON:

16:46:30 10  **Q.**  Was it your understanding that the court's order was --

11    what was your understanding of when the court's order went

12    into effect?

13    **A.**  I believed that it was post-appeal.  The framework for

14    that, I work in a world where there are many times where my

16:46:45 15    company has issued a permit and the permit is nonexistent

16    until the appeals have been exhausted.

17         So I believe that I applied that framework to this case

18    and knew that there was an appeal process underway and the

19    settlement discussions.

16:47:01 20         So I thought between the two of those, then we could

21    take action.  In the meantime, we were trying to prepare.

22    **Q.**  You referenced the settlement discussions, and you were

23    present for Ms. Momeyer's testimony regarding the ongoing

24    settlement discussions.

16:47:13 25         What was your understanding of why the settlement

Mary L. Uphold, RDR, CRR        (330) 884-7424

1    discussions would affect the date that this court's order

2    would go into effect?

3    **A.**   I believe that if there was a settlement between the

4    two parties, that the strict application of the November 6

16:47:29  5    order would be unnecessary.

6    **Q.**   Was it your understanding that a representation had

7    been made that plaintiff might not seek immediate

8    enforcement of the court's order?

9    **A.**   It was.

16:47:42  10   **Q.**   What was the board's reaction to seeing the court order

11   in a sense of what tasks were before the board?

12   **A.**   I can't speak for the rest of the board, but for

13   myself, I was surprised at the severity of it.  Again, not

14   understanding the subtlety of the possibility of using a

16:48:02  15   trade name instead.  I focused on the literal reading of it.

16       The way I read it was that it was impossible for us to

17   immediately comply with unless we froze the assets of our

18   members.

19   **Q.**   So was it your understanding, then, upon reading it

16:48:18  20   that it was immediately enforceable, and that to comply, you

21   would have to cease all use on any document or on any form

22   of FirstEnergy Federal Credit Union?

23   **A.**   Well, the latter part is correct.

24       The first part, you said "immediately enforceable."  I

16:48:31  25   thought we had to exhaust the appeals before it was

1    enforceable.

2    **Q.**   Okay.  Were you aware that a stay was filed on the date

3    that the court's order -- a request for stay was filed on

4    the date of the court's order?

16:48:46  5    **A.**   I was.

6    **Q.**   And were you aware that the reason for asking for that

7    stay was to allow for compliance in the sense of developing

8    a new name and doing the activities that Ms. Momeyer has

9    identified?

16:48:57  10    **A.**   Yes, ma'am.

11    **Q.**   And why would that stay request, in your mind -- or was

12    it, in your mind, necessary?

13    **A.**   Again, because strict compliance with the order would

14    have forced us to cease operations, and that was impossible

16:49:12  15    unless we were to put in jeopardy all of our members,

16    including my wife.

17            MS. DICKSON:  I have no further questions, Your

18    Honor, for this witness.

19            THE COURT:  Thank you.

16:49:24  20            Mr. Movius, any questions for Mr. Friend?

21            MR. MOVIUS:  No, Your Honor.

22            THE COURT:  Mr. Friend, were you aware that in

23    April of this year, 2012, FirstEnergy Family Credit Union

24    sued Federal, your credit union, because of the names being

16:49:39  25    so similar?

                Mary L. Uphold, RDR, CRR        (330) 884-7424

1          THE WITNESS:  I was.

2          THE COURT:  Do you know that a meeting was held in

3   my court's chambers about that lawsuit?

4          THE WITNESS:  Yes.

16:49:50  5          THE COURT:  And that I did certain things?

6          THE WITNESS:  I knew that the meeting took place

7   and we were briefed.

8          THE COURT:  Afterwards?

9          THE WITNESS:  After the fact.

16:49:58  10          THE COURT:  Did you learn that one of the things I

11   did was to refer this case, the lawsuit brought by Family

12   against Federal, to mediation?

13          I sent the parties downstairs to a magistrate

14   judge there.  You're aware that a mediation took place?

16:50:12  15          THE WITNESS:  Yes, ma'am.

16          THE COURT:  And it happened in September 2012.

17   Are you aware of that time frame?

18          THE WITNESS:  Yes, ma'am.

19          THE COURT:  And after that meeting with the

16:50:21  20   magistrate judge, there was a follow-up conference call with

21   the magistrate judge.

22          THE WITNESS:  Yes.

23          THE COURT:  You're aware of that?

24          THE WITNESS:  I was.

16:50:27  25          THE COURT:  Were you briefed after the initial

1    meeting, after the initial mediation?

2              THE WITNESS:  Yes.

3              THE COURT:  Were you briefed after the conference

4    call with the magistrate judge?

16:50:35  5              THE WITNESS:  Yes.

6              THE COURT:  What was your understanding as to why

7    the case didn't settle?

8              THE WITNESS:  It was my understanding that

9    FirstEnergy Family Credit Union was not amenable to any of

16:50:48 10    the options that we had put out.  The one that I thought was

11    most tenable was, in fact, a heightened communication

12    process with the members, or the field of membership, if you

13    will, that's coexistent between the two credit unions to

14    avoid the 20 or so cases of confusion that existed.

16:51:10 15              THE COURT:  And because you were aware that the

16    lawsuit was originally filed in April of 2012, did

17    FirstEnergy Federal start taking any action back then to

18    change to a name that was less similar to Family's?

19              THE WITNESS:  We started to consider it, but we

16:51:30 20    believed that we had exercised the right process to get to

21    the name change; and that, in fact, the confusion was fairly

22    limited, and by that time, we thought that it had pretty

23    much dissipated.

24              THE COURT:  It's fair then, isn't it, for me to

16:51:49 25    think that the board members didn't receive notice when I

                  Mary L. Uphold, RDR, CRR      (330) 884-7424

1    issued my preliminary injunction in early November, November

2    7, you knew way back in April that there was an issue?

3              THE WITNESS:  Yes.

4              THE COURT:  There was a mediation that was held,

16:52:03  5  but not successful, in September.  So the threat of shutting

6    down the business, all that would have to be done, you were

7    aware of that as early as April, and probably even before

8    then; isn't that true?

9              THE WITNESS:  We were, and we were resistant to

16:52:18 10  changing our name, simply because it was, A, a big impact on

11   the organization; B, potential confusion with our members,

12   beyond the confusion that had already potentially been

13   inflicted because of the similarity.  And we believed that

14   the confusion had dissipated and that we had offered

16:52:38 15  reasonable solutions.

16             THE COURT:  Thank you, sir.

17             I have no other questions for Mr. Friend.  Is

18   there any reason he cannot step down?  Mr. Skeriotis?

19             MR. SKERIOTIS:  I do have just two questions, Your

16:52:49 20  Honor.

21             THE COURT:  Please approach.

22                  CROSS-EXAMINATION OF DAVID FRIEND

23   BY MR. SKERIOTIS:

24   **Q.**  Mr. Friend, good afternoon.

16:52:57 25  **A.**  Good afternoon.

| | |
|---|---|
| 1 | **Q.**  I believe you stated that there are two reasons why |
| 2 | defendant did not comply with the court's order, and that |
| 3 | was because of the issue of the appeal and a stay; is that |
| 4 | correct? |
| 16:53:09  5 | **A.**  Correct. |
| 6 | **Q.**  Okay.  So the execution of the license agreement, would |
| 7 | it be fair to say, had no effect whatsoever in the defendant |
| 8 | not complying with the court's November 7th order? |
| 9 | **A.**  None whatsoever. |
| 16:53:22  10 | MR. SKERIOTIS:  Thank you. |
| 11 | No further questions, Your Honor. |
| 12 | THE COURT:  Thank you. |
| 13 | Mr. Friend, you may step down. |
| 14 | THE WITNESS:  Thank you. |
| 16:53:28  15 | THE COURT:  You're welcome. |
| 16 | Ms. Dickson, Mr. Pritchard, any other witnesses? |
| 17 | MS. DICKSON:  Your Honor, we were not intending to |
| 18 | call other members of the board, unless you wish to hear |
| 19 | from them.  We do have another witness, though, after that. |
| 16:53:39  20 | THE COURT:  I'd suggest you call that person that |
| 21 | you think would be most persuasive to the court. |
| 22 | MS. DICKSON:  Understandable, Your Honor. |
| 23 | MR. PRITCHARD:  Yes.  Can I call Mr. Winston, |
| 24 | please? |
| 16:53:50  25 | THE COURT:  Mr. Winston, please approach to be |

                    1    sworn.

                    2              DAVID S. WINSTON, of lawful age, a witness called

                    3    by the Defendant, being first duly sworn, was examined and

                    4    testified as follows:

    16:54:08    5              LAW CLERK:  Please be seated.

                    6              THE COURT:  Sir, am I correct in believing you

                    7    need no further coaching beyond that which you've heard me

                    8    give to other witnesses?  And you're a licensed attorney,

                    9    aren't you?

    16:54:26   10              THE WITNESS:  I am.

                   11              THE COURT:  So please take your seat and listen

                   12    for the question.

                   13              THE WITNESS:  Thank you.

                   14              MR. PRITCHARD:  Thank you, Your Honor.

    16:54:33   15              CROSS-EXAMINATION OF DAVID S. WINSTON

                   16    BY MR. PRITCHARD:

                   17    **Q.**  Mr. Winston, could you state your name and title for

                   18    the record?

                   19    **A.**  Sure.  David Winston, W-i-n-s-t-o-n.  I am an attorney

    16:54:42   20    in the FirstEnergy Legal Department.  That would be an

                   21    in-house attorney.

                   22    **Q.**  Thank you.  And you became aware of the lawsuit filed

                   23    by Family against Federal quite early on in the process; is

                   24    that correct?

    16:55:00   25    **A.**  Well, actually, I became aware after, several months

                         Mary L. Uphold, RDR, CRR        (330) 884-7424

Winston - Cross                                    78

1   after the lawsuit was filed.  If you recall, I'm the second

2   lawyer in the department who was notified of the case.

3   **Q.**  Thank you.  And when you learned about the case, did

4   you take any steps with relation to the parties?

16:55:23  5   **A.**  Sure, I did.

6   **Q.**  And what were those?

7   **A.**  I offered to mediate a resolution with the parties.  I

8   offered our offices.  I shuttled between the parties.  We

9   met for a day sometime, I believe, in May of this year.

16:55:52 10      And we had a mediation, but we were not successful in

11  solving and resolving the dispute.

12  **Q.**  Indeed.  And you encouraged me during that mediation to

13  keep in touch and to provide you with statuses as to the

14  developments in the litigation; is that correct?

16:56:07 15  **A.**  I did.  I encouraged both sides to not only provide me

16  updates of the dispute, but to call me with questions or

17  with ideas of other ways that I could help the parties solve

18  the dispute in a way that was agreeable to both.

19  **Q.**  And throughout the prosecution of the litigation, you

16:56:30 20  generally tried to remain neutralized between Family and

21  Federal; is that correct?

22  **A.**  Well, I not only tried, but I did remain neutral

23  between the parties.

24  **Q.**  And we had some discussions concerning our position

16:56:46 25  with respect to your ownership of marks that include

Mary L. Uphold, RDR, CRR        (330) 884-7424

```
  1    "FirstEnergy"; is that correct?

  2    A.  Well, they weren't so much discussions as, you know,

  3    I -- the position regarding FirstEnergy's exclusive

  4    ownership of the mark, FirstEnergy, was a position that

16:57:10  5    we've taken all along and early in the case.

  6        And I think that's reflected in the actions that we

  7    took.  I mean, I had two goals all along following my

  8    notification of this dispute, and that was, one, to find a

  9    way for the parties to resolve it in a way that they could

16:57:32  10   both live with; and two, and I think primarily, to protect

 11    the asset, that is, FirstEnergy.

 12        FirstEnergy Corp has a lot of time and values the name

 13    "FirstEnergy" very much, and it is a trademark, and we take

 14    many steps to protect it.

16:57:53  15   Q.  Indeed.  Including filing a number of applications that

 16    have matured into registrations for FirstEnergy for a

 17    variety of services; is that correct?

 18    A.  Well, I'll apologize.  I'm not a trademark attorney or

 19    an intellectual property attorney.  I have responsibility

16:58:10  20   for that, but I rely pretty heavily on my outside counsel.

 21        But if your question is do we take -- do we have

 22    multiple marks regarding FirstEnergy?  That's correct.  And

 23    we take steps and we pay fees in order to protect and

 24    preserve those marks.

16:58:32  25   Q.  Uh-huh.  And do you recall a conversation that we had
```

1    prior to the --

2            MR. PRITCHARD:  And I apologize, it was November

3    6, is that correct, the preliminary injunction hearing, Your

4    Honor?

16:58:48  5          THE COURT:  Yes, it was.

6    BY MR. PRITCHARD:

7    **Q.**  -- prior to November 6 about whether somebody from

8    FirstEnergy would be interested or available in testifying

9    at that hearing?

16:59:05  10  **A.**  Well, we had -- you know, we had telephone

11   conversations around that time.  I don't have a specific

12   recollection about FirstEnergy providing a witness.

13       I know that later, in response to a subpoena, we talked

14   about providing a witness who could talk about the origins

16:59:25  15  of the credit union's use of the word "FirstEnergy" in their

16   name.

17           THE COURT:  Mr. Pritchard, I want to say this to

18   you, because I'm not sure where you're going.  You have had

19   a distinct impression that I believe is not supported by the

16:59:41  20  facts or law in this case, and I just will state for you now

21   that I have made a finding that Family has established an

22   ownership interest in and to FirstEnergy Family marks.  I

23   know FirstEnergy has marks, a proprietary interest.  Family

24   has marks.  That's my ruling.  That stands on the record.

17:00:09  25          What you should focus your testimony on, or that

Mary L. Uphold, RDR, CRR          (330) 884-7424

1      you elicit from this witness, is that which might pertain

2      directly to my finding of contempt or not.

3              Don't waste your time if you seek to persuade me

4      by revisiting the issue of whether or not FirstEnergy has a

17:00:27  5      protected interest in FirstEnergy.  It does.  It's an asset.

6      He's correct.  That has absolutely no bearing on the asset

7      that FirstEnergy Family Credit Union has and its marks,

8      including that full name that it uses and the variations of

9      that.

17:00:43  10             So I just don't want you to press Mr. Winston, and

11      I know that Mr. Skeriotis is on the -- and I just will

12      remind you, sir, that when an attorney objects in my room,

13      you stand, and that way I can stop the answer before it

14      comes.

17:00:59  15             I am willing to allow you to persuade me, but as a

16      judge I clerked for used to say, and I've taken it to heart,

17      it does no good to your client to annoy the mind you seek to

18      persuade.

19             So if you have a point to make regarding the

17:01:15  20      motion to show cause, please make it.  But if you're going

21      to the proprietary interest that Family has in its marks, it

22      exists, and that's not to be revisited or changed in this

23      hearing.

24             MR. PRITCHARD:  Yes, Your Honor.  If I may have a

17:01:31  25      moment.

Mary L. Uphold, RDR, CRR        (330) 884-7424

Winston - Cross                                                      82

1              THE COURT:  You may.

2              (Pause.)

3     BY MR. PRITCHARD:

4     **Q.**  Did you ever convey to anyone from Family or any

17:02:23  5   representative of Family the position of FirstEnergy

6     Corporation with respect to the ownership of rights in

7     FirstEnergy?

8     **A.**  Yes.

9     **Q.**  Uh-huh.  And how did that occur?

17:02:40  10  **A.**  One occurrence happened at the mediation, and another

11    time I was approached by some board members of Family about

12    the dispute.  We work in the same building, and they came to

13    me.

14         In the course of that discussion, I told them the

17:03:03  15  position that FirstEnergy Corp, the sponsor, has held all

16    along, and that is that it is -- FirstEnergy is our mark,

17    and it can only be used by a credit union with our

18    permission.

19    **Q.**  Uh-huh.  And the intention of you drafting that license

17:03:28  20  agreement, which began before the issuance of the

21    preliminary injunction in this case, was to, in fact,

22    clarify your position in that regard?

23              MR. SKERIOTIS:  Objection.

24              THE COURT:  Before you answer, basis,

17:03:41  25  Mr. Skeriotis?

Winston - Cross                              83

1          MR. SKERIOTIS:  It supposes something that hasn't

2     been established, Your Honor; namely, that Mr. Winston

3     drafted the agreement and his intention.

4          THE COURT:  And, Mr. Pritchard, I am concerned

17:03:56  5   that while you might be circling, I am not convinced that

6     you are landing a plane anyplace close to what might be of

7     assistance to the court today.

8          MR. PRITCHARD:  Uh-huh.

9          THE COURT:  Do you have any other questions?

17:04:09 10        I sustain the objection.

11         Any other question for Mr. Winston?

12         MR. PRITCHARD:  One more moment, Your Honor.

13    Thank you.

14         (Pause.)

17:04:28 15   BY MR. PRITCHARD:

16     **Q.**  Mr. Winston, I have one last question.

17         Did you ever contemplate becoming involved in this

18    litigation?

19         MR. SKERIOTIS:  Objection, Your Honor.

17:04:38 20        THE COURT:  Sustained.

21         MR. SKERIOTIS:  Work product.

22         THE COURT:  It's just irrelevant to this hearing,

23    in addition to being work product and protected.

24         MR. PRITCHARD:  Thank you, Your Honor.  I'm

17:04:49 25   through with the witness then.

Mary L. Uphold, RDR, CRR        (330) 884-7424

Winston - Direct                    84

```
          1         THE COURT:  Thank you.

          2         Mr. Movius, no questions for Mr. Winston, right?

          3         MR. MOVIUS:  Correct, Your Honor.

          4         THE COURT:  Mr. Skeriotis?

17:04:56  5         MR. SKERIOTIS:  Yes, Your Honor.

          6         THE COURT:  I caution you, Mr. Skeriotis, not to

          7    open a door.

          8              DIRECT EXAMINATION OF DAVID S. WINSTON

          9    BY MR. SKERIOTIS:

17:05:20 10    Q.  Mr. Winston, you stated your two goals, I believe, were

         11    to provide a resolution to the instant dispute at the

         12    beginning of the outset of the case, as well as protect the

         13    "FirstEnergy" mark.  Is that correct?

         14    A.  Yes.

17:05:35 15    Q.  Did that ever change during the course of this

         16    litigation?

         17    A.  No.

         18    Q.  You utilized Ms. Barnes for outside counsel; is that

         19    correct?

17:05:53 20    A.  Correct.

         21    Q.  And I take it that you and her worked together on

         22    issues related to this litigation; is that correct?

         23    A.  Yes, that is correct.

         24    Q.  Would it be fair to say that the actions taken by

17:06:05 25    Ms. Barnes were pursuant to direction by FirstEnergy?
```

Mary L. Uphold, RDR, CRR        (330) 884-7424

1       **A.**   Yes.

2              MR. SKERIOTIS:  No further questions, Your Honor.

3              THE COURT:  Thank you.

4              Mr. Pritchard, any follow-up from that line of

17:06:16  5   questioning?

6              MR. PRITCHARD:  No, Your Honor.

7              THE COURT:  Mr. Movius?

8              MR. MOVIUS:  No, Your Honor.

9              THE COURT:  Thank you.

17:06:23 10            Mr. Pritchard, Ms. Dickson, any other witness?

11             MS. DICKSON:  May we have a moment, Your Honor?

12             THE COURT:  You may.

13             Sir, thank you.  You may step down.  Thank you for

14    waiting.

17:06:40 15            THE WITNESS:  Thank you.

16             MR. PRITCHARD:  Thank you, Your Honor.  I believe

17    that we're through with our presentation for this afternoon.

18             THE COURT:  Thank you, Mr. Pritchard.

19             Mr. Movius, any additional witnesses?

17:07:23 20            MR. MOVIUS:  I have no witnesses to call on behalf

21    of Family.

22             THE COURT:  Mr. Pritchard and/or Ms. Dickson,

23    would you care to make brief remarks by way of summation?  I

24    am giving you the opportunity.  I am open to allowing you to

17:07:36 25   do it, but I'm not encouraging it.  But I'd like you to have

1    the opportunity if you care to do so.

2              MR. PRITCHARD:  Thank you.  No, Your Honor.

3              THE COURT:  Mr. Movius, I will extend the same

4    opportunity to you, with the same indication that while I'm

17:07:53  5    providing the opportunity, I'm not encouraging it.

6              MR. MOVIUS:  No, Your Honor.  Anything I would say

7    would be just consistent with our reply brief that we filed

8    earlier today.

9              THE COURT:  Mr. Skeriotis, I suspect that your

17:08:06  10   answer would have been no in any case, but I'm extending the

11   same opportunity to you.

12             Is there anything that you would like to place on

13   the record by way of brief summation?

14             MR. SKERIOTIS:  Your Honor, I would like to just

17:08:17  15   talk a little bit about the summary that I put together, if

16   that's at all possible, if it would be helpful to the court.

17             THE COURT:  Regarding the license agreement?

18             MR. SKERIOTIS:  Regarding the license agreement

19   and the timing of it and aspects of that nature for the

17:08:31  20   court.

21             THE COURT:  If you can do it briefly, I'll allow

22   it.

23             MR. SKERIOTIS:  Well, Your Honor, first of all,

24   we're in a precarious position because we're not parties to

17:08:48  25   this lawsuit yet.  At the same time, I want to respect the

Mary L. Uphold, RDR, CRR        (330) 884-7424

1    court's wishes in providing it with enough information to

2    have the court understand that absolutely, in no way, shape

3    or form were Brouse McDowell or FirstEnergy Corp in any way

4    whatsoever attempting to disrupt this litigation, and

17:09:09  5    moreover, attempting to interfere with the court's order.

6           There is nothing more important to Brouse

7    McDowell, as well as FirstEnergy Corp, than to ensure that

8    any court order is followed by any party in any litigation.

9           So pursuant to that, I just wanted to ensure that

17:09:28  10    the court was aware that as Mr. Winston testified, there

11    were two issues that we were trying to always accomplish

12    through this, and that is to protect the "FirstEnergy" mark,

13    and, in some way, shape or form, to help with mediation.

14           And, in fact, Mr. Winston, I'm not sure if the

17:09:49  15    court is aware of this or not, served as a mediator between

16    the two parties.  And the court may have become aware of

17    that through today's hearing.

18           THE COURT:  He testified to that today.

19           MR. SKERIOTIS:  Yes.

17:09:57  20           THE COURT:  And I had some understanding of that

21    even before today.

22           MR. SKERIOTIS:  Okay.  Nothing was ever done to

23    intentionally undermine any order of this court or this

24    litigation.  Nothing was ever said to either party regarding

17:10:13  25    anything related to this litigation, including that any

1    license granted or to be granted was case dispositive or

2    anything remotely close to that.

3          The intentions were always to reduce the use of

4    the "FirstEnergy" mark by both plaintiff and defendant to

17:10:28  5    writing.  The use by both parties existed pursuant to

6    FirstEnergy Corp's agreement to allow them to use that.

7          And, in fact, the license agreement, as we said

8    earlier, was drafted on November 5th, the initial drafts,

9    and prior to that, meetings had taken place to talk about

17:10:52  10   exactly what to do with respect to that.

11         The impetus for that was a letter of October 9th

12   from the plaintiff to the defendant.  And in that letter of

13   October 9th, it stated, among other things, or implied,

14   among other things, that the plaintiff did not need a

17:11:08  15   license or any other approval from FirstEnergy Corp to use

16   the mark "FirstEnergy."

17         So pursuant to that, steps were taken, and that

18   was the impetus at that point to start to figure out exactly

19   what needed to be done, if anything, by FirstEnergy Corp so

17:11:25  20   that -- to show that its intention was that you actually did

21   need to use the mark "FirstEnergy" through approval of

22   FirstEnergy Corp.

23         So that happened pursuant to that October 9th

24   letter.

17:11:40  25         The draft of the license agreements, as I said,

Mary L. Uphold, RDR, CRR        (330) 884-7424

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 17:11:56 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 17:12:12 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 17:12:20 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 17:12:30 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 17:12:47 | 25 |

1   was in place prior to the hearing on the preliminary

2   injunction.  And the other impetus for actually sending out

3   the license agreements was Mr. Winston's subpoena for

4   deposition on November 16th.

5         THE COURT:  Just one moment, please,

6   Mr. Skeriotis.

7         (Pause.)

8         THE COURT:  Thank you, sir.  You're nearly done,

9   aren't you?

10         MR. SKERIOTIS:  Yes, I am, Your Honor.

11         THE COURT:  Let me ask this question.

12         MR. SKERIOTIS:  Sure.

13         THE COURT:  I don't know if it's in your prepared

14   remarks.  It's my understanding that Federal has entered the

15   license agreement with FirstEnergy -- with your client;

16   Family has not.

17         MR. SKERIOTIS:  That is correct, Your Honor, at

18   this point, correct.

19         THE COURT:  Thank you.  Anything else to add?

20         MR. SKERIOTIS:  Only that the license agreements

21   were sent to both parties asking for a date by which to have

22   them executed or otherwise respond to by December 15th.  So,

23   you know, partly for that issue of December 15th is to show

24   the court that we had no intentions of interfering with any

25   license -- I'm sorry, any order or anything along those

1    lines.

2              THE COURT:  You'd agree that your timing was

3    unfortunate?

4              MR. SKERIOTIS:  And that's why we're here to

17:12:54  5    explain that, Your Honor.  We absolutely recognize that.

6              But, you know, to tell the court again that the

7    drafting began October 29th, well before any injunction

8    order ever issued, was to inform the court that none of that

9    was taken pursuant to any court order or anything with

17:13:11  10   respect to that knowledge.  And it was only done pursuant to

11   trying to help resolve the case, from at least the

12   standpoint of the mark "FirstEnergy" and any rights

13   associated with that.  But in --

14             THE COURT:  I understand that, and I appreciate

17:13:25  15   it.  And Ms. Barnes has said this, and I want to make sure

16   that you're in league with her statement, that it was a

17   mistake to issue that order -- pardon me, to issue that

18   agreement with my order pending?

19             MR. SKERIOTIS:  You know, and I'm glad you pointed

17:13:41  20   that out, Your Honor.  From the standpoint that it did

21   anything to your order, we don't agree it changed a thing,

22   obviously.

23             THE COURT:  It didn't change anything

24   substantively.

17:13:51  25             MR. SKERIOTIS:  Correct.

                  Mary L. Uphold, RDR, CRR       (330) 884-7424

1          THE COURT:  Perhaps, however, based upon the

2    testimony that I've heard from Ms. Momeyer, it fueled an

3    already wrong thinking that she had, believing that there

4    were opportunities to do something other than that described

17:14:07  5    in the four corners of my preliminary injunction.

6          And in any case, it was decidedly mistaken

7    judgment, poor timing, to issue any document that touched

8    upon the matters pending before me that were under

9    preliminary injunction.

17:14:27  10          I expect you to agree with that, or I'm going to

11   be equally concerned about Brouse McDowell's behavior in

12   this as that I am of the Webb firm.

13          MR. SKERIOTIS:  It was poor timing, yes, Your

14   Honor.

17:14:39  15          THE COURT:  Unless there is something more, I

16   think I've heard all that I need to hear and I'm prepared to

17   make my ruling.

18          Is there anything more?

19          MR. SKERIOTIS:  No, Your Honor.  Thank you.

17:14:48  20          THE COURT:  I appreciate you being here today, and

21   it was wise of you to appear on behalf of Mr. Winston and

22   Ms. Barnes, so I appreciate that.

23          MR. SKERIOTIS:  Your Honor, it's a pleasure for

24   me.  We haven't had the opportunity for me to be in front of

17:14:58  25   you, so it was my pleasure being here today, and I thank you

Mary L. Uphold, RDR, CRR          (330) 884-7424

1    very much.

2            THE COURT:  This matter, as I began to spread on

3    the record in my questions placed to Director Friend, is not

4    a recently filed matter.  It's been on the court's docket

17:15:16  5    since April of this year.

6            And as we know through Mr. Winston's testimony,

7    although he didn't recall the specific dates, this matter

8    was on the radar of Federal, Family, FirstEnergy

9    Corporation.  There were attempts to mediate before the

17:15:30  10    matter was ever filed in federal court.  There were attempts

11    to mediate while it was filed in federal court.  I engaged

12    counsel and the parties in discussion in my chambers during

13    the case management conference.

14            I cannot begin to think of a legitimate or

17:15:46  15    reasonable reason for the posture that this case is in today

16    relative to the motion to show cause for me to determine

17    whether or not defendant is in contempt of my preliminary

18    injunction order docketed at ECF 39 issued on November 7th,

19    2012.

17:16:05  20            Despite the entry and service of that order,

21    Defendant FirstEnergy Federal Credit Union continues using

22    "FirstEnergy Federal Credit Union," "FirstEnergy Federal,"

23    "FirstEnergy FCU," "FEFCU" and the FirstEnergyFCU.com domain

24    name in contravention of the express prohibitions of that

17:16:32  25    order.

Mary L. Uphold, RDR, CRR        (330) 884-7424

1          The court's preliminary injunction order has been

2     resisted and disobeyed by Defendant FirstEnergy Federal

3     Credit Union; the President and CEO of defendant's Board of

4     Directors, Diane Momeyer; the Board of Directors, and I find

17:16:49  5     to a lesser extent based upon what I've heard, although

6     Mr. Friend's testimony encourages me that the Board of

7     Directors were fully informed and still persistent in

8     contravention of my order; and most disconcertingly, by lead

9     attorney for Defendant FirstEnergy Federal Credit Union,

17:17:09 10     Mr. Matthew Pritchard and his assistant counsel, and I

11     apologize, Ms. Dickson, because you've shown yourself to be

12     so much more than an assistant today, but I just mean to

13     distinguish you from lead counsel, Cecelia Dickson.

14          The act of disobedience or resistance has been

17:17:32 15     malicious, willful and deliberate, as distinguished from

16     accidental, inadvertent or negligent violation.  And I take

17     as one evidence of that the signature of Ms. Momeyer on the

18     license agreement, which was extended after my November 7,

19     2012 order was in place.

17:17:49 20          The deliberate or intended violation of my

21     preliminary injunction order has been shown by clear and

22     convincing evidence.

23          In view of defendant's contempt and its continuing

24     infringement and my expectation that it intends to continue

17:18:05 25     infringing based upon the testimony I've heard here today, I

1    find that this is an exceptional case under 15, U.S.C.,

2    Section 1117, subpart (a), such that plaintiff will be

3    entitled to recover its attorneys' fees in the event

4    defendant ultimately is found liable after a trial on the

17:18:25  5    merits.

6          That concludes my findings of fact at this time.

7    When I docket this, I intend to amplify those findings of

8    fact as necessary.

9          Conclusions of law.

17:18:38  10         A federal court has the power to impose civil or

11    criminal sanctions on a party and/or an attorney who fails

12    to comply with a lawful, specific court order.  Pursuant to

13    18, U.S.C., Section 401, subpart (3), a court may punish

14    contempt of its authority, including resistance to its

17:18:57  15    orders.

16          Section 401, subpart (3) of Title 18 provides:

17          "A court of the United States shall have power to

18    punish by fine or imprisonment, or both, at its discretion,

19    such contempt of its authority, and none other, as, subpart

17:19:15  20    (3), disobedience or resistance to its lawful writ, process,

21    order, rule, decree or command."

22          Violation of a definite and specific court order

23    must be shown by clear and convincing evidence before

24    sanctions can be imposed for violation of that order.

17:19:33  25         By virtue of the conduct that I've described,

Mary L. Uphold, RDR, CRR          (330) 884-7424

1      which has been substantiated by the testimony taken in court

2      here this afternoon, Defendant FirstEnergy Federal Credit

3      Union; the President and CEO of Defendant, Diane -- of

4      Defendant Federal's Board of Directors, Diane Momeyer;

17:19:53  5      members of the Board of Directors; the attorneys,

6      Mr. Pritchard and Ms. Dickson, are hereby adjudged guilty of

7      civil contempt of court, in violation of 18, U.S.C., Section

8      401(3) for failing to comply with the preliminary injunction

9      order docketed as ECF number 39 and entered on November 7,

17:20:13  10      2012.

11          The court hereby imposes a fine of $1,000 per day

12      that Defendant FirstEnergy Federal Credit Union remains

13      noncompliant with the preliminary injunction upon

14      FirstEnergy Federal Credit Union, Ms. Momeyer, members of

17:20:35  15      the Board of Directors and Attorneys Pritchard and Dickson.

16          The conduct of Defendant FirstEnergy Federal

17      Credit Union, Ms. Momeyer, members of the Board of Directors

18      and the attorneys makes this case an exceptional one within

19      the meaning of Section 1117(a) of Title 15 of the United

17:20:55  20      States Code.

21          Plaintiff is entitled to its reasonable attorneys'

22      fees and expenses.  Plaintiff shall, therefore, recover its

23      attorneys' fees and reasonable expenses.

24          The court will determine the amount of any such

17:21:09  25      award after plaintiffs have submitted to counsel for its

1    review a full -- defense counsel, that is, full and complete

2    record of the expenses and billable time charged by the

3    separate attorneys and law clerks for the work performed in

4    the case at bar, and that incurred in pursuit of the motion

17:21:32  5    to show cause.

6         At the close of this case, plaintiff shall serve

7    and file a supplemental memorandum in support of its

8    application for an award of attorneys' fees and expenses

9    against defendant.

17:21:46  10         The safe distance rule that was articulated by the

11   Sixth Circuit and requested by plaintiff in its moving

12   papers for preliminary injunction is declined.  At this

13   time, the court declines to invoke the safe distance rule

14   and order that FirstEnergy Federal may not use that compound

17:22:08  15   word to comply with the preliminary injunction.

16         Mr. Pritchard, Ms. Dickson, I will allow you to

17   file on my docket, no later than tomorrow, a motion asking

18   me to stay the terms of this preliminary -- this finding of

19   contempt.

17:22:27  20         I caution you not to give me a blanket motion

21   without detailing what it is you intend to do to bring your

22   client into compliance and the time frame within which you

23   intend to take such action.

24         Can I make myself any more clear?

17:22:46  25         MS. DICKSON:  No, Your Honor.

Mary L. Uphold, RDR, CRR        (330) 884-7424

1              MR. PRITCHARD:  Absolutely not, Your Honor.

2              THE COURT:  Plaintiff's counsel?

3              MR. MOVIUS:  No, Your Honor.

4              THE COURT:  Ms. Barnes, you're on notice that if

17:22:56   5    there's any other further action on your part or on the part

6    of FirstEnergy Corporation to impede or to assist in what I

7    consider to impede the enforcement of my order or to assist

8    in the violation of my order, I will take serious and

9    necessary action.

17:23:13  10              Can I make myself any more clear on that?

11              MS. BARNES:  No, Your Honor.  I understand.

12              THE COURT:  Unless there is something more, I

13    intend to adjourn this hearing.

14              Defense counsel?

17:23:24  15              MR. PRITCHARD:  No.

16              MS. DICKSON:  No, Your Honor.

17              THE COURT:  Plaintiff's counsel?

18              MR. MOVIUS:  No.  Thank you, Your Honor.

19              THE COURT:  Counsel for FEC?

17:23:30  20              MR. SKERIOTIS:  No, Your Honor.

21              THE COURT:  Board of Directors, you're all free to

22    leave at this time.  This matter is adjourned.

23              LAW CLERK:  All rise.

24              (Proceedings concluded at 5:23 o'clock p.m.)

25

Mary L. Uphold, RDR, CRR          (330) 884-7424

1                       C E R T I F I C A T E

2

3         I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled

5    matter.

6

7                 S/Mary L. Uphold              December 5, 2012
                  Mary L. Uphold, RDR, CRR        Date
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

3      DIRECT EXAMINATION OF DIANE LYNN MOMEYER        18
       BY MS. DICKSON
4
       CROSS-EXAMINATION OF DIANE LYNN MOMEYER         44
5      BY MR. MOVIUS

6      CROSS-EXAMINATION OF DIANE LYNN MOMEYER         61
       BY MR. SKERIOTIS
7
       DIRECT EXAMINATION OF DAVID FRIEND              67
8      BY MS. DICKSON

9      CROSS-EXAMINATION OF DAVID FRIEND               75
       BY MR. SKERIOTIS
10
       CROSS-EXAMINATION OF DAVID S. WINSTON           77
11     BY MR. PRITCHARD

12     DIRECT EXAMINATION OF DAVID S. WINSTON          84
       BY MR. SKERIOTIS
13

14

15

16

17

18

19

20

21

22

23

24

25